PER CURIAM
*912 **549 This case is before us on a recommendation from the Commission on Judicial Fitness and Disability. The commission filed a formal complaint alleging 13 misconduct counts against respondent, involving the following judicial conduct rules and constitutional provisions: Oregon Code of Judicial Conduct Rule 2.1 (promoting confidence in the judiciary); Rule 2.2 (prohibiting using judicial position for personal advantage); Rule 3.3(B) (prohibiting manifestation of bias or prejudice in the performance of judicial duties); Rule 3.7(B) (judge must be patient, dignified, and courteous to litigants); and Article VII (Amended), sections 8(1)(b), (c), and (e), of the Oregon Constitution (prohibiting willful misconduct bearing a demonstrable relationship to the effective performance of judicial duties; willful or persistent failure to perform judicial duties; and willful violation of a judicial conduct rule). After conducting a hearing, the commission filed a recommendation with this court, to the effect that clear and convincing evidence supported a conclusion that respondent had violated multiple rules with respect to eight of the counts, including violations not alleged in the complaint. The commission further recommended that respondent be removed from office. See ORS 1.430(1) (if commission holds hearing, Supreme Court shall review record of proceedings and may discipline judge); Or. Const., Art. VII (Amended), § 8(1) (in manner provided by law, Supreme Court may censure, suspend, or remove a judge from judicial office for specified misconduct). Respondent argues that we should dismiss all or several counts for procedural reasons; that the commission did not sufficiently prove the alleged misconduct; and, in any event, that the only appropriate sanction is a censure.
For the reasons explained below, we dismiss two of the eight counts of complaint that are at issue, and we also do not consider any violation that the commission now recommends that it did not allege in its complaint. We further conclude, however, that the commission proved by clear and convincing evidence that respondent engaged in some of the misconduct alleged in the remaining six counts. We suspend respondent, without pay, for three years.
**550 I. FRAMEWORK FOR ANALYSIS AND EVALUATION OF RECORD
We begin by describing the constitutional and statutory framework that defines our task in this case.
A. Authority to Censure, Suspend, or Remove a Judge
Under Article VII (Amended), section 8(1), of the Oregon Constitution, this court may censure, suspend, or remove from judicial office a judge who has engaged in certain willful misconduct, as follows:
"(1) In the manner provided by law, *** a judge of any court may be removed or suspended from his [or her] judicial office by the Supreme Court, or censured by the Supreme Court, for:
"* * * * *
"(b) Wilful misconduct in a judicial office where such misconduct bears a demonstrable relationship to the effective performance of judicial duties; or
"(c) Wilful or persistent failure to perform judicial duties; or
"* * * * *
"(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court[.]"[1]
*913 That constitutional provision was originally adopted by the people in 1968, following a 1967 legislative referral; it was amended to its current form in 1976. Or. Laws 1967, Senate Joint Resolution 9; Or. Laws 1975, Senate Joint Resolution 48; see also In re Fadeley , 310 Or. 548, 553, 802 P.2d 31 (1990) (describing history). Pursuant to the authorization in Article VII (Amended), section 8(1)(e), this court has established a Code of Judicial Conduct, revised from time to time, that applies in judicial fitness **551 proceedings.[2] In re Schenck , 318 Or. 402, 405, 870 P.2d 185, cert. den. , 513 US 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).
Also in 1967, the legislature passed an accompanying act that created what is now the Commission on Judicial Fitness and Disability, and established the process for judicial fitness and disability proceedings. Or. Laws 1967, ch. 294; Fadeley , 310 Or. at 553, 802 P.2d 31 ; see also ORS 1.410 - 1.480 (current statutes). Under that statutory framework, the commission may hold a hearing following an investigation, ORS 1.420 (1)(a) ; if the commission finds that the judge's conduct justifies censure, suspension, or removal from office, the commission then "shall recommend to the Supreme Court" one of those three identified sanctions, ORS 1.420(4). Consistent with the constitutional provisions just cited, however, only this court has authority to censure, suspend, or remove a judge from office. See also ORS 1.430(1) (if commission holds hearing, this court shall review the record of proceedings on law and facts, and may impose an identified sanction); In re Jordan , 290 Or. 303, 308, 622 P.2d 297, clarified on petition for reh'g , 290 Or. 669, 624 P.2d 1074 (1981) ( Jordan I ) (commission's statutory duty is to make recommendation to this court concerning censure, suspension, or removal).[3] And, as alleged in this case and as required by the Oregon Constitution, such a sanction may be imposed only as a result of willful misconduct or willful violation of a judicial conduct rule. In re Gustafson , 305 Or. 655, 657, 756 P.2d 21 (1988).
B. "Wilful" Misconduct
This court has explained that, for constitutional purposes, "wilful" misconduct under Article VII (Amended), sections 8(1)(b), (c), and (e), combines elements of "intent" and "knowledge": A judge's conduct is "wilful" "if the judge intends to cause a result or take an action contrary to the applicable rule and if [the judge] is aware of the circumstances that in fact make the rule applicable, whether or not **552 the judge knows that he [or she] violates the rule." Gustafson , 305 Or. at 660, 756 P.2d 21 (emphasis added); see also Schenck , 318 Or. at 405, 870 P.2d 185 (judge must have "the conscious objective of causing the result or of acting in the manner defined in the rule of conduct" (internal quotation marks omitted) ). "It is not enough that a judge was negligent [and] should have known better," but, conversely, a "benign motive" will not excuse either an intentional or knowing violation "of a nondiscretionary norm." Gustafson , 305 Or. at 559-60, 756 P.2d 21 (internal quotation marks omitted).
C. Burden of Proof and Standard of Review
The commission must establish alleged violations of the Code of Judicial Conduct by clear and convincing evidence. Commission on Judicial Fitness and Disability Rule of Procedure (CJFDRP) 16.a.; Schenck , 318 Or. at 405, 870 P.2d 185 ; see also ORS 1.415(3) (commission shall adopt rules of procedure governing proceedings under ORS 1.420 ); Jordan I , 290 Or. at 307, 622 P.2d 297 (purpose of judicial fitness proceeding is "proper administration of justice for the public good"; proceedings are not criminal in nature, and burden of proof is clear and convincing evidence, rather than proof beyond *914 reasonable doubt). "Clear and convincing evidence means that the truth of the facts asserted is highly probable." In re Miller , 358 Or. 741, 744, 370 P.3d 1241 (2016). If witness testimony about key facts is in conflict, then the record must establish that it is "highly probable" that the testimony that supports the allegations is true. See In re Knappenberger , 344 Or. 559, 571, 186 P.3d 272 (2008) (lawyer discipline, so demonstrating); In re Bishop , 297 Or. 479, 485, 686 P.2d 350 (1984) (same). Respondent is entitled to a presumption that he did not engage in the alleged misconduct. See In re Jordan , 295 Or. 142, 156, 665 P.2d 341 (1983) ( Jordan II ) (lawyer discipline; so stating).
This court's review of the record is de novo . See In re Gallagher , 326 Or. 267, 284, 951 P.2d 705 (1998) (citing ORS 1.430(1) for that proposition). As this court previously has explained, in deciding whether the commission's proof is clear and convincing, we "make our own independent evaluation of the evidence" and then "decide whether the conduct, based on our findings of the facts, constitutes conduct proscribed by **553 the Oregon Constitution." In re Field , 281 Or. 623, 629, 576 P.2d 348, reh'g den. , 281 Or. 638, 584 P.2d 1370 (1978).
II. FACTS
A. Introduction
Respondent is a Marion County Circuit Court judge, who was appointed to the bench in fall 2011 and then elected in 2012. The events at issue occurred beginning in fall 2012 and continuing through 2014. The commission initially, and briefly, investigated a particular 2012 incident, as described below, but decided not to file a formal complaint. About 18 months later, it commenced a more expansive investigation about additional allegations, and it revisited the 2012 incident. The commission filed a formal complaint in June 2015 that set out 13 counts, including the 2012 incident as well as other, subsequent alleged misconduct. It conducted an evidentiary hearing several months later. The commission then filed an opinion with this court, which included findings of fact, analysis, and conclusions of law. The opinion determined that, as to eight counts, respondent committed multiple rule and constitutional violations, including several not alleged in the formal complaint. As to five counts, the commission recommended dismissal.
We provide a general factual summary below pertaining to the eight counts identified in the commission's recommendation. Later in this opinion, we discuss many of the facts-several of which are disputed-in greater detail.[4]
B. Alleged Misconduct; Complaint Allegations; Hearing; and Commission Recommendations
1. Interactions at soccer games and response to related commission inquiry (Counts 1 and 2)
In fall 2012, one of respondent's sons played on a soccer team for Chemeketa Community College. In October, **554 respondent's son was injured during a game that respondent attended, which prompted respondent to think poorly of the ability of a referee, Deuker, to manage player safety. After the game, respondent approached Deuker in the officials' area. His and Deuker's accounts of what happened next varied. In respondent's account, he stated his intent to file an official complaint, asked for Deuker's name, and provided a business card after being asked for his contact information. In Deuker's account, respondent-while complaining about the officiating-"shoved" his business card at Deuker, which identified him as a circuit court judge, prompting Deuker to feel intimidated by him. Deuker sought advice after the *915 game from a longtime referee, Allen, who advised him to report the incident to another official, as well as to the commission, and Deuker did so.
A few weeks later, Allen attended a Chemeketa playoff game. According to Allen, as he watched the field after the game, he noticed respondent-whom he did not know but assumed to be the judge from before-crossing toward the officials. From several yards away, Allen put his hands up and yelled at respondent to leave and go back to the spectators' area. Respondent replied that he only had wanted to tell the referees that they had done a good job, and then he turned and walked toward the team. A week later, Allen wrote to the commission. In his letter, he referred to Deuker's earlier complaint; summarized what he characterized as a second attempt by respondent to "intrude" on the officials' area; and explained that he had "intercepted" respondent and advised him to leave.
The commission assigned a single 2012 case number to Deuker's and Allen's reports, and, in early January 2013, it sent an inquiry to respondent. Respondent wrote back later the same month, explaining his interaction with Deuker after the first game and describing a physical altercation with an unidentified man after the second game. As to the first game, respondent stated that he had produced his business card after being asked to provide contact information. As to the second game, respondent stated that, as he started to thank the officials, he had been physically accosted and almost thrown down by a man matching **555 Allen's description, who had yelled that he had no authority to be near the officials.
The commission assessed those "diametrically opposed" written versions of the events and determined that respondent's version "[rang] more true." In February 2013, the commission sent respondent a letter stating that it had concluded that the "complaint"-that is, Deuker's and Allen's initiating complaints to the commission-"should be dismissed."
About 18 months later, the commission began investigating other misconduct allegations involving respondent, prompting it to further investigate Deuker's and Allen's reports, including interviews with Deuker, Allen, and others who had attended the soccer games. In its June 2015 formal complaint, the commission included two counts relating to those incidents, notwithstanding its earlier dismissal notification to respondent. Count 1 described respondent's conduct after the first game in approaching the officials' area, complaining about Deuker's officiating, and producing his circuit court business card; and charged him with violating Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary); Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge); Rule 2.2 (prohibiting using judicial position for personal advantage); and Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). Count 2 described respondent's written statement in his responding letter to the commission about being physically accosted after the second game, alleged that that statement was false, and charged respondent with again violating Rule 2.1(C) and Article VII (Amended), section (8)(1)(e), as well as Rule 2.1(D) (prohibiting conduct involving dishonesty, deceit, or misrepresentation).
At the hearing, the commission heard testimony from respondent, Deuker, Allen, and others who had been present at the games. As to both Counts 1 and 2, the commission determined that respondent had violated all the rules alleged, as well as Article VII (Amended), section 8(1)(e).
**556 It further determined that he had violated another rule in connection with Count 2-Rule 3.12(A) (not being candid with disciplinary authority)-when he reported to the commission that he had been physically accosted after the second game.[5]
*916 2. Relationship with Veterans Treatment Court participant; participant's handling of firearms; related court inquiry and commission investigation (Counts 3, 4, 5, and 6)
The next group of allegations arose in connection with respondent's role as judge of the Marion County Veterans Treatment Court (VTC), which originally began as a Veterans Treatment Docket and then transitioned to a funded VTC in October 2013. The VTC operates similarly to a drug court, involving a post-adjudicative, collaborative, and interdisciplinary team model that includes a judge, a deputy district attorney, two defense attorneys, a probation officer, a VTC coordinator, a law enforcement representative, treatment professionals, one or more Veteran's Administration specialists, a veteran mentor coordinator, and an assessor. Participants are probationers who have pled guilty to criminal charges and have been accepted into the VTC to work through a multi-phase, 18-to 24-month program that provides them with support and addresses their unique needs-including medical, psychological, housing, benefits, and vocational training-as well as reintegration into their communities. Most VTC participants had pled guilty to misdemeanor charges, but felony charges were sometimes involved. VTC courtroom proceedings, which all participants were required to attend, were intentionally more relaxed and informal than ordinary court proceedings. One goal of the VTC was to improve participant accountability by increasing their contacts with VTC team members, both in court and, depending on the circumstances, out of court. Because the VTC was new at the time of the events at issue, its practices were evolving.
**557 The record shows that, in his work with the VTC, respondent genuinely cared about the participants. He put his "heart and soul" into the VTC, motivated by his desire to honor and assist veterans, not to promote his own interests. He had "tremendous respect" for the participants, cared for them, and wanted to help their positive transition back to society. The record also shows that respondent had a deep respect for, a sincere interest in, and a fascination with, military history and the work of the armed forces.
In June 2013, a veteran to whom we refer as BAS was accepted onto the Veterans Treatment Docket-later transitioning to the VTC-after he pled guilty to felony driving under the influence of intoxicants (DUII).[6] His judgment of conviction, which respondent signed, provided for 24 months' supervised probation, with conditions, and for reduction of his felony conviction to a misdemeanor on successful completion. His plea agreement included a lifetime driver's license revocation, and his probation conditions included compliance with the Veterans Treatment Docket and a statutorily based prohibition on possessing firearms.[7]
BAS was a decorated former Navy SEAL, who had served at least 12 deployments.[8] He had many significant needs relating to his veteran status-including Post-Traumatic Stress Disorder (PTSD), traumatic brain injury (TBI), substance abuse, and a debilitating knee injury. He lived outside Salem on a rural farm and had no friends or family in the area, nor a driver's license.
Respondent and the VTC team began working with BAS, whom they had assessed as high-risk. Outside of court, team members drove BAS to appointments and other errands, and they sometimes visited his home with groceries or to visit or check on him. A back-up VTC judge, Judge Ochoa, took BAS to a Portland museum and drove him to appointments; the deputy district attorney took him **558 hiking and bike-riding (with defense counsel's consent); and respondent's son drove him to appointments and became *917 friendly with him.[9] Respondent also encouraged his clerk to socialize with BAS and to serve as a confidant for him. By about the end of 2013, respondent had gone to BAS's home at least twice.
Due to the unique nature of BAS's military service and his personality, some members of the VTC team, including respondent, developed a special interest him. In September 2013, respondent asked to interview BAS for an article about the VTC that he was writing. BAS did not feel as though he could decline to be interviewed because he worried that declining might harm his case, but he did not convey that to respondent.
Later that fall, respondent and BAS had joking interactions during open VTC hearings about BAS's firearms prohibition. Those interactions showed a continuing acknowledgement-by both respondent and BAS-of that prohibition.
As the holiday season approached, the VTC team grew concerned about BAS's well-being-namely, his isolation and the danger of self-harm-and they discussed making a concerted effort to keep him socialized. In mid-November, respondent arranged for BAS to work at the home of his son-in-law, Mansell. Before driving BAS to Mansell's home, respondent took him to a small, brief wedding ceremony that respondent had agreed to officiate. There, respondent introduced BAS as a Navy SEAL and used his call sign, which made BAS feel as if he were "on display."
Respondent then took BAS to Mansell's home. BAS had been told that other VTC participants would be there, but none were. The work involved preparing cabinetry for a lacquer application. BAS located three hidden drawers in the cabinetry, opened one, and found a gun. The surrounding circumstances are in dispute. According to BAS, respondent had challenged him to find a hidden drawer containing a gun; BAS found it and asked respondent if he could handle **559 it; and respondent said yes. BAS then checked the gun and put it back.[10] According to Mansell and respondent, Mansell had challenged BAS to find the hidden drawers while respondent worked on a carpentry project across the room and was not paying attention; BAS found a drawer containing an unloaded gun but did not handle it; Mansell made a comment about the gun; and respondent vaguely heard the comment but was not aware of the situation.
Out-of-court interactions between BAS and respondent continued. Respondent invited BAS to Thanksgiving dinner, but BAS declined due to illness. They had other text exchanges in that same timeframe. In early December, respondent attended a VTC conference with a Marion County Circuit Court colleague, Judge Prall, and he and BAS texted during the conference. Also while there, respondent and Judge Prall met a famous Navy SEAL and others who were friends of BAS's, and they learned more about BAS's military service. During that conference, respondent and Judge Prall discussed judicial boundaries with treatment court participants, and Judge Prall told respondent that she did not have out-of-court interactions with participants, aside from incidental greetings. At around the same time, BAS was admitted to a three-week treatment program in Texas for his TBI, and he and respondent texted while he was there. He returned to Oregon shortly before Christmas.
On Christmas Eve, BAS accepted an invitation to a holiday dinner at the home of Judge Ochoa and his wife; the VTC coordinator, Lambert, and the VTC deputy district attorney also attended. On Christmas evening, respondent invited BAS to a family brunch at his home the next day, to celebrate respondent's birthday.
BAS attended the brunch. Judge Ochoa and the deputy district attorney also had been invited but were unable to attend; the only other attendants were respondent's family *918 members. Unbeknownst to respondent, BAS was uncomfortable-he felt out of place, and he was not **560 comfortable discussing military, political, and religious issues with respondent and his family. While there, BAS noticed a particular gun case and commented that it held a "good weapon." Within the next few days, respondent and BAS had more text exchanges.
In early January 2014, BAS's pellet stove-which was his only heat source-stopped working, and the VTC team discussed their concerns about BAS being isolated in the cold weather with no heat. On a Sunday, respondent and his son drove to BAS's home to bring him lunch and check the stove. Unbeknownst to respondent, his son had brought the gun that BAS had noticed at the brunch to show to BAS. Again, the surrounding circumstances are in dispute. According to BAS, while respondent's son was handling the gun with respondent sitting nearby, BAS asked respondent if he could show his son how to handle the gun safely. Respondent answered affirmatively and also said that, because he had signed BAS's probation order, he could make "adjustments." BAS then handled the gun. Again according to BAS, at the end of the visit, BAS told respondent that his son would be returning later that day to target-shoot with BAS using the gun; respondent stated that he had no objection; and, later that day, his son and BAS shot the gun on BAS's property.[11] According to respondent, he had been working with the broken stove while his son and BAS were in another part of the room. He heard BAS say something that caught his attention, and he looked and saw BAS holding the gun. Respondent denied having said anything to BAS about the gun, and he testified that he had not thought about BAS's felon status-and accompanying firearms prohibition-at that time. He also testified that he did not learn about the target-shooting until much later, when the commission investigation was underway.
Respondent and BAS texted again over the following week. In the last exchange, respondent offered to bring BAS a working heat source, but BAS declined. Respondent suggested that BAS was "disengaging," but BAS stated that **561 he was not. By this time, BAS had confided in respondent's clerk, as well as an assigned taxi driver who took him to appointments, that he felt uneasy and overwhelmed about respondent's out-of-court contacts with him, but he thought that he needed to acquiesce to avoid more severe consequences in his case. Respondent did not know about those conversations.
About a week after the second gun-handling incident, BAS told respondent's clerk that respondent and his son had brought a gun to his home, and she told Lambert. Lambert spoke to BAS right away; he confirmed that the incident had occurred and also described the earlier incident at Mansell's home. BAS told Lambert that he felt distraught by the constant contact and was concerned that, if he did not do what respondent wanted, his felony conviction might not be reduced to a misdemeanor at the end of his probation. He also expressed concern about going to jail for a firearms violation. Lambert immediately memorialized their conversation afterwards, in notes to herself.
Lambert then spoke to respondent. She told him about BAS's concern regarding the contacts from him and his family, and respondent agreed that, in light of BAS's discomfort, those contacts should be reduced, and they stopped thereafter. At the commission hearing, respondent testified that it had not occurred to him that, over those few months, he had placed BAS in a difficult position, as a probationer in his court.
During the same conversation, Lambert also told respondent that she knew about both gun-handling incidents, and she mentioned BAS's felon status. According to respondent, that conversation was the first time that he had thought about BAS's felon status, and he became greatly concerned that negative implications could flow to BAS in light of his firearms prohibition. He then told the VTC deputy district attorney, as well as BAS's lawyer and probation officer, that his *919 son had shown BAS a gun. The deputy district attorney evaluated whether to criminally charge BAS, but decided not to do so.
In February, BAS went back to Texas for treatment, and, while there, he secured a job that required carrying a **562 firearm. The VTC team decided that it was appropriate to reduce his felony to a misdemeanor. Respondent signed a judgment to that effect, nunc pro tunc , effective June 2013. BAS moved to Texas and participated in several more VTC hearings by telephone. At an April hearing, he mentioned that he was traveling to visit his ill father, and his father died not long after that. At a May hearing, respondent offered his condolences to BAS, who was reserved and found it difficult to talk. After BAS reported that he had been in only sporadic contact with his mentor, respondent ordered additional contact, but BAS thereafter had difficulty connecting with his mentor.
At a hearing in August, BAS reported that he had stopped trying to contact his mentor, but respondent reiterated his earlier order, and he ordered BAS to write a paper about the importance of mentor contact.[12] BAS became very angry and upset about some of respondent's comments in court, and he called Lambert afterwards, stating that he needed to talk to someone about respondent. Lambert suggested that he speak to Presiding Judge Rhoades, and Lambert reported their conversation to Judge Rhoades, including telling her about the gun-handling incidents and other issues involving BAS and respondent.
Judge Rhoades then spoke with BAS by telephone, and he told her about the second gun-handling incident and some of his other contacts with respondent. The next day, she reassigned BAS's case to Judge Prall, and she arranged to meet with respondent, with another judge, Judge Penn, in attendance. The purpose of the meeting was to confirm whether any of respondent's conduct relating to BAS should be reported to the commission, but respondent did not know the topic of the meeting in advance.
At their meeting, Judge Rhoades told respondent that she had received information about his out-of-court contact with BAS and, referring to the second gun-handling incident, that he had been present when BAS had handled a gun. Respondent initially denied remembering that incident. After Judge Rhoades provided additional information, **563 he acknowledged it, but he denied that he had given BAS permission to handle the gun, and he stated that he had not known at that time that BAS was a felon. Judge Rhoades did not think that respondent was forthcoming. Judge Penn similarly did not think that respondent sounded truthful about his lack of awareness concerning BAS's felon status, and he described respondent as clarifying or modifying his answers to various questions throughout the meeting. For his part, respondent characterized the meeting as akin to a "star chamber"; he had been shocked and caught off-guard by the questions and what he thought was an aggressive tone. As the meeting ended, Judge Rhoades and Judge Penn expressed their view that the second gun-handling incident should be reported to the commission, and respondent confirmed that he would self-report.
Soon thereafter, respondent sent a letter to the commission, stating that he had been recently advised that a VTC participant had contacted his presiding judge "with concerns about an interaction he had with me in January of this year." He provided BAS's name and case number, but no additional detail. Judge Penn had advised respondent to write a letter that was general in nature because its purpose was to provide the commission with sufficient information to begin an investigation. A few weeks later, Judge Penn called the commission to inquire about the status and realized that additional information was needed, so he sent some documentation and provided the names of staff members who might be appropriate to interview. An investigator hired by the commission later interviewed several witnesses, including respondent. During his December 2014 interview, respondent told the investigator that, during the second gun-handling incident, he *920 had been in another part of the room working on the stove; he had simply observed the interaction with the gun between his son and BAS; and there had been no discussion about whether BAS should touch the gun.
Meanwhile, BAS successfully completed his probation after his case was reassigned to Judge Prall. Several witnesses testified that BAS had demonstrably benefitted from his participation in the VTC-he had become sober, his debilitating knee injury and other health issues had **564 been addressed, he had received treatment for his TBI and PTSD, and he could function in society and was employable. Overall, he was in a healthier emotional and mental state than when he entered the program. BAS also testified that he appreciated respondent's assistance and kind treatment of him, and he previously had acknowledged that respondent and the entire VTC team had wanted what was best for him.
As to the conduct directly involving BAS, following its investigation, the commission charged respondent with two identical counts for each gun-handling incident (Counts 3 and 4), alleging violations of Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary), Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge), and Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). It also charged those same rule and constitutional violations, as well as a violation of Rule 3.7(B) (judge must be patient, dignified, and courteous to litigants), as part of alleging an improper relationship between respondent and BAS (Count 6). That count specifically alleged that respondent had "singled BAS out for attention and improperly imposed himself onto BAS," thereby placing BAS "in the position of being subject to [respondent's] attentions, while being aware of [respondent's] control over his probation status." As to respondent's meeting with Judge Rhoades and Judge Penn, and his interview with the commission's investigator, the commission charged respondent with violating Rule 2.1(D) (prohibiting conduct involving dishonesty, deceit, or misrepresentation), and, again, Article VII (Amended), sections 8(1)(b) and (e) (Count 5). The complaint specifically alleged that respondent untruthfully had told Judge Rhoades and Judge Penn that he "did not know" that BAS had been convicted of a felony, and that he had "denied" to the commission, when asked about the second gun-handling incident, that he had told BAS that he "waived" the firearms prohibition.
At the hearing, the commission heard testimony from BAS by telephone and heard live testimony from **565 respondent, Judge Rhoades, Judge Prall, Judge Penn, Lambert, other members of the VTC team, and other witnesses. The commission expressly found BAS's testimony to be credible, and it determined that respondent had violated all the rules and constitutional provisions alleged in Counts 3 through 6, except that it made no finding on Article VII (Amended), section 8(1)(b), on Count 5. It further determined that respondent had violated several additional rules: As to both Counts 3 and 4, the commission found violations of Rule 2.1(B) (prohibiting commission of criminal act) and Rule 3.9(A) (prohibiting ex parte communications); and, as to Count 5, the commission found a violation of Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge) and Rule 3.12(A) (not being candid with disciplinary authority).
3. Funding for "Heroes and Heritage Hall" (Count 9)
In connection with his work on the VTC, respondent created a "Heroes and Heritage Hall" in an open, public area on the same floor of the Marion County Courthouse as his courtroom. The Hall was a military artwork and memorabilia gallery that was intended to recognize military service, commemorate local veterans, and bring attention to veteran-related issues. Respondent hung items of his own and items donated by others. To professionally complete and frame some pieces, he used both personal funds and funds from a nonprofit foundation that had partnered with the VTC.
*921 As the Hall artwork display expanded, local lawyers-some of whom appeared before respondent-inquired about it. Respondent spoke with some of them about sponsoring memorabilia pieces for particular well-known local lawyers and judges who were veterans. Respondent thought that those pieces provided encouragement to the VTC participants because they showed that other veterans had addressed their military-related issues and then gone on to serve their community in distinguished ways. Each lawyer who had agreed to sponsor all or part of a memorabilia piece wrote a check payable to the order of the foundation and then either mailed the check to the foundation or to respondent's chambers, or dropped it off in his chambers.
**566 Information about the Hall came to the commission's attention when it interviewed witnesses in connection with respondent's initial self-report. Following its investigation, the commission alleged in Count 9 of its complaint that, by collecting money from lawyers who appeared before him in court to sponsor veteran-related art, with donation checks delivered to him at the courthouse, respondent violated Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary), and Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). In its opinion, the commission determined that respondent had intentionally "solicit[ed]" donations and thus had violated the rule and constitutional provisions as alleged, as well as Rule 4.5(A) (prohibiting personal solicitation of funds).[13]
4. Screening process for same-sex marriage requests (Count 12)
After he became a judge, respondent regularly solemnized marriages for members of the public, pursuant to ORS 106.120.[14] At that time, the Oregon Constitution stated that "only a marriage between one man and one woman shall be valid or legally recognized as a marriage."
**567 Or. Const., Art. XV, § 5a (adopted by initiative petition in 2004). In May 2014, an Oregon federal district court judge ruled that Oregon's constitutional ban on same-sex marriage and related statutory provisions violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Geiger v. Kitzhaber , 994 F.Supp.2d 1128, 1139 (D. Or.), appeal dismissed , 2014 WL 8628611 (9th Cir. 2014), cert. den. , --- U.S. ----, 135 S.Ct. 1860, 191 L.Ed.2d 726 (2015). Marion County Circuit Court judges did not receive any specific instruction about solemnizing marriages after that ruling.
Respondent's clerk and his judicial assistant (JA) knew that respondent thought that marriage should be permitted between only opposite-sex couples, based on his own sincere and firmly held religious beliefs. After the federal court ruling, they asked respondent about any changes to the process in his chambers for solemnizing marriages. He instructed that, when his chambers received any marriage request, the JA or the clerk should obtain the couple's names, addresses, *922 dates of birth, and telephone numbers; and then check the Oregon Judicial Information Network (OJIN) to see if the couple had existing case records and, if so, to confirm their genders.[15] If the JA or clerk determined that the couple was a same-sex couple, then they should call the couple back and say that respondent was not available or they should otherwise provide that information to respondent, so that he could decide how to proceed. If the couple was an opposite-sex couple, however, then the wedding date should be put on respondent's schedule. Respondent's staff was not comfortable with the instruction to check OJIN-which they had not previously done-and to provide incorrect information about respondent's availability.
On one occasion, respondent's JA checked OJIN and discovered that a requesting couple might be a same-sex couple. Respondent had an actual scheduling conflict on the requested date, however, so she truthfully told the couple **568 that he was not available. Several weeks after that, respondent stopped solemnizing marriages altogether.
Respondent's JA testified at the hearing that she never had seen respondent act in any way that had dis-criminated against any lesbian, gay, bisexual, or transgender (LGBT) person. Other witnesses-including sitting judges-similarly testified that they never had known respondent to discriminate against anyone and never had heard respondent make any derogatory remark about the LGBT community.
Respondent's in-chambers process for handling same-sex marriage requests came to the commission's attention when its investigator interviewed respondent's JA and his clerk in connection with respondent's initial self-report. Following its investigation, the commission charged respondent in Count 12 of its complaint with violating Rule 3.3(B) (prohibiting manifestation of bias or prejudice in performance of judicial duties), and Article VII (Amended), sections 8(1)(b), (c), and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful or persistent failure to perform judicial duties; willful violation of judicial conduct rule). The allegation stated that he inappropriately had screened, and ordered his staff to screen, same-sex couples because he refused to marry such couples even though their marriages were lawful. Following the hearing, the commission determined that respondent's screening practice had violated Rule 3.3(B) as alleged, as well as Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule).[16] It further determined that that same practice had violated Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary), and his direction to his staff to lie to the public about his availability had violated Rule 2.1(D) (prohibiting conduct involving dishonesty, deceit, or misrepresentation).
**569 5. Additional factual and procedural background
a. Testimony supporting respondent's reputation for honesty
At the commission hearing, many witnesses-including several sitting judges-testified that respondent had a reputation for truth, honesty, and veracity. After considering all the evidence, however, the commission expressly found respondent's testimony to be disingenuous in several respects.
b. Commission's additional factual findings
In its opinion, after making factual findings on each count of complaint, the commission summarized additional factual findings not related to any particular count. It later relied on several of those findings-specifically, those supporting its unfavorable view *923 of respondent's credibility and its determinations that he had engaged in a pattern of self-benefit and had displayed a lack of boundaries-as part of its consideration of the appropriate recommended sanction. After reviewing the record, we conclude that none of those additional final factual findings bear on our evaluation of the complaint allegations or our assessment of an appropriate sanction, and so we do not discuss them.
c. Commission did not amend its complaint
At the close of the commission's case, its counsel suggested that the commission had discretion to add counts to the complaint, to conform to the evidence. The chair responded that the commission's rules contemplated a motion, to which counsel responded that she would prepare such a motion at a later time. See CJFDRP 10.b. (commission, at any time prior to determination, may allow or require amendments; complaint may be amended to conform to proof; if amendment made, judge shall be given reasonable time to answer and prepare and present defense). Respondent countered that fundamental due process required that he be apprised of additional charges. The commission's counsel never submitted a written motion to amend or otherwise proposed any amendment. Nonetheless, as described, the commission ultimately determined that respondent committed multiple rule violations not alleged in the complaint.
**570 6. Sanction
In assessing the appropriate recommended sanction, the commission considered several factors that, in its view, revealed patterns of misconduct on respondent's part. First, it determined that respondent's conduct showed that he had little insight concerning the boundaries that a judicial position requires. Second, it observed that respondent had engaged in a pattern of self-benefit, including that he had "exploit[ed] his judicial position to satisfy his personal desires." Third, it determined that respondent had engaged in a pattern of dishonesty. And finally, the commission opined that, even after he became the subject of an investigation in August 2014, respondent had been "unable to understand the magnitude of his actions in relation to the Code of Judicial Conduct." The commission summarized respondent's misconduct as "frequent and extensive," including actions taken "for personal gain and * * * amounting to criminal behavior," as well as misconduct that "impugn[ed] his honesty and integrity" and "undermine[d] the public's confidence in the judiciary." The commission unanimously concluded-and recommended to this court-that the appropriate sanction was removal from office.
III. RESPONDENT'S PRELIMINARY MOTIONS AND PROCEDURAL ARGUMENTS
Respondent makes several preliminary motions and procedural arguments, which we address below.
A. Counts 1, 2, 3, 5, 6, 9, and 12-Motion to Dismiss, Lack of Authority
Respondent first argues that the commission lacked statutory authority to file all counts that were not the result of his self-report to the commission-that is, all counts except Count 4 (which involved BAS and the second gun-handling incident). He contends that the commission's authority to investigate and bring charges is narrowed by ORS 1.420(1), which requires an initial "complaint" by "any person." All counts other than Count 4 derived from the commission and its investigation, or, as to the soccer-related counts (Counts 1 and 2), from an effective "re-fil[ing]" of an old inquiry that was previously dismissed. Accordingly, in respondent's **571 view, none of those counts were statutorily authorized. As explained below, we disagree.
ORS 1.420(1) provides that, "[u]pon complaint from any person concerning the conduct of a judge or upon request of the Supreme Court," and following an investigation, the commission may hold a hearing and take other alternative actions. In In re Sawyer , 286 Or. 369, 594 P.2d 805 (1979), this court considered whether ORS 1.420(1) requires the filing with the commission of a formal initiating complaint that must be disclosed to the judge. In that case, no initiating complaint *924 had been filed, and the judge contended that the commission therefore had no jurisdiction to act. Id. at 373, 594 P.2d 805. This court first explained that, as with attorney discipline proceedings (and unlike in criminal proceedings), judicial fitness proceedings do not require that the judge be notified of the accuser's identification in advance. Id. at 374, 594 P.2d 805. Next, the court explained that the reference in ORS 1.420(1) to a "complaint from any person" did not necessarily impose a jurisdictional requirement of a formal complaint by an identifiable person. Instead, the statute "contemplates that the Commission may undertake the investigation of the conduct of a judge upon the basis of any information coming to it from 'any person,' including any information coming to it through any of its members or staff." Id. at 375, 594 P.2d 805. The court additionally recognized that, in the event of a factual dispute, "an accused judge would be entitled to examine any evidence developed during the course of the investigation that was favorable to the judge." Id. at 374, 594 P.2d 805.
The court's reading of ORS 1.420(1) in Sawyer applies in this case, as well: The fact that the commission received a new initiating report (from respondent) that directly concerned only one count of complaint did not deprive it of authority to charge the remaining counts following its investigation. In light of Sawyer , we deny respondent's motion to dismiss Counts 1, 2, 3, 5, 6, 9, and 12, on jurisdictional grounds.
B. Counts 2, 3, 4, 5, 9, and 12-Recommended Misconduct Determinations Not Alleged in Commission's Complaint
On Counts 2, 3, 4, 5, 9, and 12, as described earlier, the commission determined that clear and convincing **572 evidence supported all the rule violations, and almost all the constitutional violations, alleged in the complaint. Also on those counts, the commission determined that respondent had committed 10 rule violations not alleged in the complaint.[17] As part of challenging the sufficiency of the evidence supporting those counts, respondent argues that the commission acted improperly when it made recommendations about unalleged violations. For the reasons explained below, we agree.
This court has explained that, as a necessary component of due process, a judge against whom a judicial fitness complaint has been filed is entitled to adequate notice, "i.e. , information sufficiently specific to permit [the judge] to understand precisely where, when, how and before whom he [or she] is alleged to have committed [certain] acts" that purportedly violated specified ethical rules. State ex rel. Currin v. Comm'n on Judicial Fitness , 311 Or. 530, 532-33, 815 P.2d 212 (1991) ; see also id. at 533, 815 P.2d 212 ("[a]dequate notice is a necessary component of due process of law"); CJFDRP 8.c. (complaint against judge must specify "in ordinary and concise language the charges against the judge and the alleged facts upon which such charges are based"). Recently, in In re Ellis/Rosenbaum , 356 Or. 691, 344 P.3d 425 (2015), the court explained that an accused lawyer who **573 is the subject of a disciplinary proceeding must be put on notice "of the conduct constituting the violation, as well as the rule violation at issue," including a sufficient allegation of facts in connection with a charged allegation. Id. at 738, 344 P.3d 425 (internal quotation marks omitted; citing Bar Rule of Procedure (BR) 4.1(c), which requires complaint to set out alleged misconduct *925 and rules violated); see also In re Coe , 302 Or. 553, 556, 731 P.2d 1028 (1987) (lawyer discipline; service of complaint and notice of answer satisfied due process requirements). By way of illustration, in In re Thomas , 294 Or. 505, 525, 659 P.2d 960 (1983), the Oregon State Bar alleged several rule and statutory violations in a particular cause of complaint. The trial board found that the lawyer had not committed the alleged violations, but it did find that he had committed an unalleged statutory violation. The parties did not brief the alleged violations on review, so only the unalleged violation was at issue. Id. at 526, 659 P.2d 960. This court dismissed the cause of complaint, explaining that an attorney must be given "reasonable written notice of the charge against him." Id. ; see also In re Chambers , 292 Or. 670, 676, 642 P.2d 286 (1982) (rejecting trial board's finding that lawyer engaged in misrepresentation when pleadings contained no allegation putting lawyer on notice of misrepresentation charge; "[t]he proof supports this finding, but the pleadings do not").
The complaint against respondent did not allege 10 of the rule violations that the commission ultimately found. And, the commission did not, at any point of the proceedings, amend its complaint pursuant to its rules, although that possibility was raised and discussed. We conclude that respondent had insufficient notice as to the 10 unalleged rule violations, and we therefore do not consider them. Cf. In re Skagen , 342 Or. 183, 215, 149 P.3d 1171 (2006) (lawyer discipline; explaining that no due process violation occurred, based on a failure to provide notice of charges, because the Bar had filed an amended complaint incorporating updated allegations); In re J. Kelly Farris , 229 Or. 209, 214-15, 367 P.2d 387 (1961) (lawyer discipline; explaining that a Bar procedural rule, which had provided the lawyer with reasonable time to defend against any amendment to the complaint that the panel permitted, "provide[d] for **574 all the essential ingredients of due process" that were at issue).[18]
C. Counts 1 and 2-Motion to Dismiss "Revived" Counts Previously "Dismissed"
Respondent next argues that we should dismiss Counts 1 and 2-the earlier soccer-related allegations-because the commission impermissibly "revived" those counts in its formal complaint. As previously described, in early 2013, after evaluating initiating complaints from Deuker (a soccer referee) and Allen (a longtime soccer official) about respondent's conduct at two soccer games in fall 2012, as well as respondent's January 2013 letter that responded to those complaints, the commission had determined that respondent's version of the events "[rang] more true." It therefore notified respondent in February 2013 that the "complaint"-that is, Deuker's and Allen's initiating complaints-"should be dismissed." About 18 months later, however, the commission began investigating respondent's self-report about BAS, and, in early 2015, it reinvestigated the soccer-related incidents. The commission's investigator interviewed Deuker, Allen, and others, and the commission later notified respondent of its intent to file charges. It then included Counts 1 and 2 in its formal complaint, filed in June 2015. Count 1 alleged that respondent had engaged in misconduct during the first game, by stating his intention to report Deuker while producing a business card that identified him as a circuit court judge. Count 2 alleged that respondent had falsely stated in his January 2013 letter responding to the commission's inquiry that, after the second game, he had been physically accosted by an unknown person, presumably, Allen.
In challenging Counts 1 and 2 on procedural grounds, respondent emphasizes the wording of the commission's February 2013 initial dispositional letter to him, to the effect that the 2012 "complaint" "should be dismissed." In his view, the commission's rules do not permit "reconsideration" of an earlier dismissal of an initiating complaint; neither do they permit the commission to "reviv[e]"
*926 such a **575 complaint. It follows, he argues, that the commission was precluded from charging Counts 1 and 2. The commission disagrees. It asserted below that the earlier dismissal had not been "with prejudice," and it argues in this court that its rules permitted a reinvestigation of the soccer-related incidents once it later determined, as part of the investigation into other alleged misconduct, that respondent had not been forthcoming about the BAS gun-handling incidents. Stated differently, the commission argues that it received and developed new information-its own assessment that respondent was not always truthful-that warranted a reinvestigation of the soccer-related complaints. As explained below, we conclude that the commission's rules precluded it from charging Count 1, but permitted charging Count 2.[19]
CJFDRP 7 sets out a comprehensive structure for the commission's investigation and disposition of an initiating complaint about a judge. See also ORS 1.415(3) (commission shall adopt rules of procedure governing judicial fitness proceedings). That rule first provides that, once the commission receives information indicating that a judge may have engaged in misconduct, it must make whatever investigation it deems necessary, "to determine whether formal proceedings should be instituted and a hearing held." CJFDRP 7.a.; see also ORS 1.420(1) (upon complaint about judicial misconduct and after such investigation that commission considers necessary, commission may take series of alternative actions).[20] That is, at the **576 investigation phase, a "formal proceeding[ ]" has not yet been instituted. See CJFDRP 8 (setting out process for "formal proceedings," initiated by commission's filing of formal complaint against judge). Also, as explained earlier, the scope of the commission's authority to investigate extends to information about purported judicial misconduct that comes to its attention through its own members or staff. Sawyer , 286 Or. at 375, 594 P.2d 805 ; see also CJFDRP 7.a. (commission may initiate an investigation "on its own motion").
As part of its investigation, the commission may send an inquiry to the judge requesting information about the allegations. CJFDRP 7.b. The purpose of such an inquiry is for the commission "to develop basic information regarding the [initiating] complaint * * * to assist [it] in evaluating the merits of [that] complaint." Id. The commission also may compel the production of any documents as may be required for its investigation. CJFDRP 7.a.
CJFDRP 7 then sets out three potential dispositions at the close of the investigation phase. First, the commission may determine that the judge's conduct departed from ethical standards, but was not sufficiently serious to warrant a hearing. In that event, the commission may make the judge aware of the objectionable conduct and then "shall dismiss the complaint." CJFDRP 7.c. Second, the commission may determine that the judge's conduct departed from ethical standards sufficiently to warrant a sanction. In that event, the commission "shall notify the judge of the investigation, the nature of the charges, and the Commission's intent to issue a formal complaint." CJFDRP 7.d. The judge, in turn, "shall be afforded reasonable opportunity to make a statement in writing explaining, refuting or admitting the alleged misconduct." Id. After notifying the judge pursuant to that rule, and after considering the judge's response, *927 the commission then may initiate formal proceedings. CJFDRP 8.a. Third, "[a]t any stage in the proceedings," if the commission's investigation discloses "that there is not sufficient cause to warrant further proceedings," then "the case shall be dismissed"; if the judge had been notified of the pendency of the complaint, **577 then the judge "shall be provided notice of the dismissal." CJFDRP 7.e.[21]
In this case, the commission's 2013 activity in response to Deuker's and Allen's initiating complaints about respondent's conduct at the 2012 soccer games followed CJFDRP 7.a., b., and e.-that is, the commission undertook an investigation to determine whether formal proceedings should be held; it requested information from respondent; and then, after considering his response, it determined that there was not "sufficient cause to warrant further proceedings," CJFDRP 7.e., and it therefore "dismissed" the "case," id. , and provided notice to respondent of that dismissal.
**578 However, as part of its later investigation relating to respondent's self-report about BAS, the commission decided to reinvestigate Deuker's and Allen's previously dismissed initiating complaints, because its investigation into the BAS-related incidents prompted it to disbelieve respondent's January 2013 letter responding to those earlier complaints. That is, after already having decided that it must dismiss the soccer-related initiating complaints under CJFDRP 7.e., and after having done so, the commission in effect returned to a "preliminary investigation" phase under CJFDRP 7.a. Respondent contends that the commission's rules did not permit that course of action.
As a general matter, we agree with respondent's premise that, once the commission investigates information about judicial misconduct and determines that it must follow one of the dispositional pathways set out in CJFDRP 7.c., d., or e., it may not reinvestigate that same information under CJFDRP 7.a. and reach a different dispositional outcome. In reviewing CJFDRP 7 as a whole, we first observe that each dispositional pathway establishes a mandatory course of action for the commission to take at the conclusion of its investigation. See CJFDRP 7.c., d., and e. (each providing that commission "must" or "shall" take designated course of action, if preliminary criteria met). Second, the criteria for each dispositional pathway are mutually exclusive-that is, the commission's evaluation of its investigation can lead to only one of the three alternative outcomes. Compare CJFDRP 7.c. (commission must dismiss if investigation reveals misconduct that departs from Code of Judicial Conduct but is not sufficiently serious to warrant public hearing), with 7.d. (commission must notify judge of intent to file charge and provide judge with opportunity to respond, if investigation *928 reveals misconduct that warrants censure, suspension, or removal), and 7.e. (commission must dismiss if investigation discloses insufficient cause to warrant further proceedings). It follows that, when the commission determines after an investigation that the criteria for one of the dispositional pathways are satisfied, it necessarily also decides by implication that the criteria for the other two pathways are not satisfied. That is, those alternative pathways are not available outcomes following the commission's **579 investigation into particular information about problematic judicial conduct.
But, this case does not precisely fit the scenario just described. It is true that, in 2013, the commission initially investigated Deuker's and Allen's complaints, sent an inquiry to respondent, and dismissed under CJFDRP 7.a., b., and e. And, it is true that, in 2014, the commission reinvestigated the same information set out in Deuker's and Allen's initiating complaints and then decided to move forward with formal charges under CJFDRP 7.d. The commission reinvestigated the original initiating complaints, however, because it developed what it characterizes as additional, new information to investigate: its own unfavorable assessment of respondent's credibility, which derived from its separate investigation into the BAS gun-handling incidents. The question before us, then, is when-if at all-the commission's rules permit a reinvestigation, and grant authority to file formal charges, based on new information about misconduct that already had been the subject of a previous investigation that the commission had resolved by dismissal under CJFDRP 7.e.
Nothing in the text of the commission's rules expressly precludes a reinvestigation of that sort. In that regard, we think it important that the key purpose of judicial fitness proceedings-including the commission's preliminary investigation phase-is to preserve public confidence in the integrity, as well as the impartiality, of the judiciary. Schenck , 318 Or. at 438, 870 P.2d 185. That purpose would be thwarted if the commission were unable to investigate any new information that related to earlier information that it already had investigated, but had resolved by dismissal because further proceedings had not been warranted based on the initial information alone. For example, the commission might receive initial information about an act of judicial misconduct that carried little credible weight, resulting in dismissal; but, later, the commission might receive credible information from a different source about the same or related misconduct that warrants a reinvestigation.
At the same time, however, the text of the commission's rules similarly do not expressly permit a reinvestigation, **580 based on new information, of misconduct previously resolved by dismissal under CJFDRP 7.e. And, notably, the established criteria for the three mandatory, mutually exclusive pathways set out in CJFDRP 7.c., d., and e., suggest that the commission's authority is not unlimited. That is, the commission does not appear to have unlimited authority to reinvestigate alleged misconduct that it previously resolved by dismissal, based on additional, new information of any kind.
To ensure that CJFDRP 7 operates as intended, we conclude that the commission's authority to reinvestigate alleged misconduct that it previously disposed of by dismissal under CJFDRP 7.e. depends on consideration of the following factors: (1) the quality and nature of the new information; (2) the nexus between the new information and the original information that the commission previously investigated, which had led to dismissal under CJFDRP 7.e.; (3) the relative seriousness of the alleged misconduct that was the subject of that earlier dismissal; and (4) the amount of time that has passed since that dismissal. A balancing and consideration of those factors ensures that the commission ultimately is guided by the dispositional criteria expressly set out CJFDRP 7.c., d., and e.-that is, whether sufficient cause warrants any further proceeding at all; or whether the apparent misconduct is not sufficiently serious to warrant a hearing; or whether the apparent misconduct was more serious in nature. That approach also is informed by principles of both fairness and finality.
We now apply that framework to Count 1 of the commission's formal complaint.
*929 Count 1 alleged the same facts (and related rule violations) about respondent's conduct at the first 2012 soccer game-producing a business card that identified him as a circuit court judge while complaining about the officiating and stating an intent to file an official complaint-that had derived from Deuker's (and, somewhat, Allen's) initiating complaints. The commission previously had dismissed those complaints in February 2013 under CJFDRP 7.e., because it thought that respondent's conflicting account of his interaction with Deuker after the first game, set out in his January 2013 letter, "[rang] more true." Almost two years later, in the latter part **581 of 2014, the commission came to think that respondent had been untruthful in connection with the BAS gun-handling incidents, which prompted it to question the veracity of his January 2013 letter, as well. It therefore reinvestigated the soccer-related initiating complaints under CJFDRP 7.a. in early 2015, by interviewing Deuker, Allen, and others, and it ultimately notified respondent under CJFDRP 7.d. of its intent to file formal charges.
After considering the factors outlined above, we conclude that the commission did not have authority under its rules to reinvestigate respondent's conduct at the first soccer game under CJFDRP 7.a. The new information on which the commission relied to reinvestigate the alleged misconduct at issue in Count 1 consisted solely of its own unfavorable assessment of respondent's credibility in connection with the BAS gun-handling incidents. That assessment did not derive from any new information connected to the soccer-related incidents, and it did not derive from any assessment of respondent's credibility in relation to those incidents. Instead, it derived from the commission's investigation into other, unrelated alleged misconduct that occurred more than a year later. And, it was not bolstered by any new facts about what actually had occurred at the soccer games. Stated another way, the commission's "new information"-its general sense that respondent was not truthful-was only marginally and tenuously related to the initiating complaints that had been the subject of the earlier 2013 investigation. Additionally, the conduct at issue-particularly when viewed in light of the other alleged misconduct-was not of a significantly serious nature.[22] And, the commission did not commence its reinvestigation until almost two years after dismissing the original initiating complaints.
**582 In sum, regarding the misconduct alleged in Count 1, the commission was bound by its earlier disposition of dismissal under CJFDRP 7.e. We therefore dismiss Count 1 of the complaint.[23]
We turn to Count 2, which we analyze differently. Count 2 did not allege any of the same 2012 conduct on respondent's part that Deuker and Allen had identified in their initiating complaints (which the commission *930 in turn had investigated and dismissed in early 2013). Instead, Count 2 alleged that, in his January 2013 letter responding to the commission's inquiry about Deuker's and Allen's initiating complaints, respondent had made a willful false statement about having been accosted after the second soccer game by an unidentified person. Unlike the misconduct alleged in Count 1, the commission neither had previously investigated that misconduct under CJFDRP 7.a., nor had it reached any dispositional determination under CJFDRP 7.c., d., or e. Count 2 thus does not involve any question about whether the commission permissibly relied on new information to reinvestigate an earlier initiating complaint of misconduct that it previously had dismissed.
It is true that, when it evaluated respondent's letter in early 2013, including his statement about having been accosted, the commission apparently found that letter and statement to be credible. It therefore took no action about respondent's statement at that time-such as commencing an investigation into the veracity of the statement **583 or engaging in further inquiry with respondent, under CJFDRP 7.a. and b. Rather, it commenced its investigation of respondent's statement later, in early 2015, once it developed an unfavorable assessment of respondent's credibility in the course of its more expansive investigation into other purported misconduct. And then, once it investigated the statement under CJFDRP 7.a., it determined that respondent had engaged in misconduct that may warrant a sanction-willfully making a false statement-and so it formally notified him of its intent to file formal charges, CJFDRP 7.d., and it later included Count 2 in its complaint. Nothing in the commission's rules precluded it from proceeding in that way; to the contrary, the steps that the commission took in relation to Count 2 were entirely consistent with its rules.[24]
In sum, we agree with respondent that the commission's rules did not authorize it to charge Count 1, and we dismiss that count. We disagree as to Count 2, and we address that count on the merits further below.
D. Procedural Due Process Challenges
Respondent raises several procedural due process challenges that, in his view, require dismissal of either the entire complaint or, at the least, Counts 3 through 6 (the BAS-related counts). Respondent specifically challenges an appellate court rule that governs the order of briefing in this court; various commission rules that purportedly did not ensure his right to due process; and certain actions that the commission took during the hearing. We **584 have considered those challenges, but we conclude that they are without merit and that further discussion would not benefit the bench, bar, or the public.[25] See *931 generally Morrissey v. Brewer , 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (within the constitutional requirement of notice and opportunity to be heard, "due process is flexible and calls for such procedural protections as the particular situation demands"); In re Devers , 328 Or. 230, 233, 974 P.2d 191 (1999) (lawyer discipline; essential elements of due process are notice and opportunity to be heard, and to "defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction" (internal quotation marks omitted) ); Currin , 311 Or. at 533, 815 P.2d 212 (judicial fitness; adequate notice is necessary component of due process).
We now proceed to consider whether, under the standards set out at the outset of this opinion, 362 Or. at 550-53, 413 P.3d at 412-14, the evidence clearly and convincingly established the alleged misconduct violations that are before us.
**585 IV. ANALYSIS OF ALLEGED MISCONDUCT
A. False Statement in Response to Commission's Inquiry About Soccer-Related Conduct (Count 2)
1. Summary of alleged misconduct
We first summarize the relevant facts underlying Count 2. Allen, a longtime referee, attended a playoff soccer game ("second game"), involving the Chemeketa team on which respondent's son played, after referee Deuker had expressed to another official a concern about an interaction with respondent at the end of an earlier game ("first game"). After the second game ended, Allen saw respondent cross the field and begin to approach the officials, and Allen put his hands up and yelled at respondent to leave. He sent a letter to the commission a week later, stating that he had "intercepted" respondent and told him to leave.
In response to the commission's resulting inquiry, respondent sent a detailed letter to the commission that recounted the events differently. He reported that, as he approached the officials after the second game and began to thank them, he was
"grabbed by my shoulders from behind without warning, whirled around, nearly picked [up] off my feet and forcefully thrown forwards. I nearly went down on my hands and knees, but was able to right myself."
Respondent next stated that the man involved in that altercation, who generally matched Allen's description, then yelled something about respondent having no authority to be near the officials. He further stated that fans and players around him "were as shocked as I was and several came to see if I was OK." He also stated that he briefly had spoken to a Chemeketa representative who was present, who referred to the other man as a "self proclaimed official."
Count 2 alleged that respondent's first statement quoted above-about being grabbed and almost thrown down-was false and, instead, that no physical contact had occurred between respondent and an official after the second game. That count then alleged that respondent had violated the willful rule violation provision of Article VII
**586 (Amended), section 8(1)(e), set out above, 362 Or. at 550, 413 P.3d at 912, as well as Rules 2.1(C) and (D) of the Code of Judicial Conduct, which provide:
"Rule 2.1 Promoting Confidence in the Judiciary
"* * * * *
"(C) A judge shall not engage in conduct that reflects adversely on the judge's character, competence, temperament, or fitness to serve as a judge.
*932 "(D) A judge shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."
At the hearing, the commission heard testimony from Allen, respondent, and other witnesses that included the Chemeketa athletics director, an assistant referee, and respondent's son.[26] All the witnesses testified that, as the second game ended, a brief fight had broken out between some players, which caused some confusion on the field. Allen testified that he and respondent had remained about 15 yards away from each other and had no physical contact, and he had not seen anybody else have any physical contact with respondent. The athletics director and the assistant referee testified to the same effect as Allen: Although their attention had been somewhat diverted because of the fight, both had seen respondent stopped at some distance by the man who had yelled at him and gestured for him to stop, respondent then turned away, and no physical interaction had occurred. The assistant referee identified Allen, whom he knew, as the man who had stopped respondent. The athletics director did not know Allen, but she thought that the man involved had attended the game at another officials' request, in light of Deuker's earlier complaint about respondent's conduct at the first game. Respondent's son testified that he had not seen the interaction, but stated that respondent had told him immediately afterward, as they were leaving the game, that someone had grabbed his shoulders from behind, pushed or shoved him enough to cause him to lose his balance, and yelled at him. For his part, respondent testified at **587 his deposition-in testimony that the commission's counsel introduced as evidence at the hearing-consistently with the version of events set out in his letter, and he referred to his letter at times when offering that testimony.
In evaluating the evidence, the commission expressly found Allen to be a "very credible" witness, who presented as "very straightforward, honest and genuine" in his demeanor. By contrast, it found respondent's testimony to be inconsistent with "virtually every other witness" and therefore not credible. The commission ultimately determined that respondent had violated the rules and constitutional provision as alleged.
For the reasons explained below, we conclude that the commission proved Count 2 by clear and convincing evidence.
2. Analysis
As with other allegations at issue in this case, key facts are in dispute because respondent's version of the events differs from those of other witnesses. Our evaluation of the evidence thus turns on two factors: witness credibility and, otherwise, whether the commission's evidence clearly and convincingly shows that respondent engaged in the alleged misconduct. See In re Fitzhenry , 343 Or. 86, 103-04, 162 P.3d 260 (2007) (lawyer discipline; discussing consideration of credibility assessments coupled with de novo record review); In re Martin , 328 Or. 177, 189, 970 P.2d 638 (1998) (same); In re Trukositz , 312 Or. 621, 629, 825 P.2d 1369 (1992) (same; also noting that, "where * * * the testimony of the witnesses is so divergent, a resolution as to who is telling the truth is usually best left to an assessment of credibility").
In assessing witness credibility, this court "may avail itself of the assistance provided by the work performed by the [c]ommission." Jordan I , 290 Or. at 307, 622 P.2d 297. And, when the commission makes express credibility findings based on the witness's demeanor and manner of testifying, we give weight to those findings. See Fitzhenry , 343 Or. at 103, 162 P.3d 260 (lawyer discipline; so stating); see also Jordan I , 290 Or. at 307, 622 P.2d 297 (factfinder that heard the witnesses testify is better qualified to determine disputed factual questions than the court, which "read [s] the cold, printed record" (internal quotation **588 marks omitted); while not conclusive, factfinder's determination entitled to respect). Then, as to this *933 court's review of the record, we "assess credibility based on objective factors, such as the inherent probability or improbability of testimony, whether testimony is internally consistent or inconsistent, whether the testimony is corroborated or contradicted, and so on." Fitzhenry , 343 Or. at 104, 162 P.3d 260 ; see also Schenck , 318 Or. at 420-21, 870 P.2d 185 (when objective factors are in play, court on de novo review is as well-equipped as commission to make credibility determinations).
In this case, after hearing Allen's testimony, the commission made an express, favorable finding about his credibility, based on its observations of his demeanor and manner of testifying. We give weight to that finding.
We further conclude that additional evidence supported Allen's version of events, rather than respondent's. Most notably, the two other hearing witnesses who saw the interaction between Allen and respondent described having seen a person (whom one of them knew to be Allen) put up his hands-while at a distance from respondent-and tell or gesture to respondent to leave, and respondent then turned away and walked toward the team. Both those witnesses had been on alert to watch for spectators approaching the officials' area, in light of Deuker's earlier report, and neither saw any physical interaction or altercation between respondent and Allen or anyone else.[27] Also, respondent wrote in his letter to the commission that several nearby fans and players had been shocked by the physical interaction and checked on his well-being afterwards, and that he had spoken to a Chemeketa representative about it at the time. But, at the hearing, no eyewitness corroborated respondent's account.[28]
**589 In this court, respondent emphasizes the post-game confusion on the field and reiterates that he did not know Allen, suggesting that he may have been accosted by someone who was not Allen. That is, Allen and the eyewitnesses all could have been correct that Allen did not physically interact with respondent, but somebody did, and the witnesses simply did not see it. The evidence, however, contradicts that theory. Notably, both respondent's January 2013 letter to the commission and his deposition testimony described a single interaction, between respondent and some "self proclaimed official" whom he did not know, occurring in the following way: Respondent walked toward the officials and was grabbed from behind as he did so and almost thrown down, and someone then immediately yelled at him to stay away from the officials. In his letter, he wrote that the person who had accosted him also had yelled at him; in his deposition, he testified that, after stumbling from the contact, he saw a person with his hands up yelling at him to leave the area, and that may have been the same person who had accosted him. The two eyewitnesses-the assistant referee and the athletics director-also described a single event involving respondent and Allen, a longtime official, including Allen putting his own hands up in a "stop" position, but without engaging in any contact with respondent. The assistant referee in particular had seen respondent start to cross the field to approach the officials and Allen put up his hands; he then watched respondent stop short of Allen and leave the area. Neither he nor the athletics director, whose attention had been drawn when Allen yelled at respondent but otherwise testified to the same effect, saw any physical interaction between respondent and Allen or anyone else. And, as noted, no independent evidence supported respondent's account, notwithstanding his statement in his letter that others immediately nearby had been shocked by the altercation and that he had spoken to a Chemeketa representative about it at the time.
*934 In sum, on de novo review, Allen's recounting of his interaction with respondent is highly probable, while respondent's is not. We conclude that the commission established by clear and convincing evidence that respondent made a false statement in his responding letter, when **590 he asserted that he had been accosted after the second game.
That determination, in turn, demonstrates that respondent violated Rule 2.1(D), which prohibits a judge from "engag[ing] in conduct involving dishonesty, * * * deceit, or misrepresentation." See also Jordan I , 290 Or. at 313-15, 622 P.2d 297 (court concluded, after reviewing evidence de novo and considering commission's credibility findings, that judge gave false statement under oath). In making that false statement, respondent also violated Rule 2.1(C), because making a false statement to the commission in response to a judicial conduct inquiry amounted to "conduct that reflects adversely on the judge's character * * * to serve as a judge." Rule 2.1(C); see also Jordan I , 290 Or. at 315, 622 P.2d 297 (after determining that judge gave false statement under oath, court stated that "a judge cannot effectively perform his judicial duties when his integrity has been directly impugned, as in this case").[29] That is particularly true where, as here, respondent's false statement involved an accusation that another person had accosted him.
Finally, we agree with the commission that those rule violations were willful under Article VII (Amended), section 8(1)(e). The evidence supports a reasonable inference that respondent intentionally made a false statement in his letter to the commission: He was given time to draft the letter, and he set out in the letter a detailed factual account that is at odds with other clear and convincing evidence in the record. And, respondent was aware of the circumstances that made the rules applicable: He was responding to a formal inquiry from the commission charged with investigating allegations of judicial misconduct, and the Code of Judicial Conduct required him to respond in a forthright manner. See generally Rule 3.12(A) (judge shall cooperate and be candid with disciplinary authority).
**591 In sum, clear and convincing evidence supports the alleged violations of Rule 2.1(C), Rule 2.1(D), and Article VII (Amended), section 8(1)(e), under Count 2.
B. Relationship with VTC Participant BAS; Gun-Handling Incidents; Related Court Inquiry and Commission Investigation (Counts 3 through 6)
We first set out a brief factual and procedural summary relating to Counts 3 through 6 of the complaint, to provide context for the discussion that follows. We then discuss and evaluate the evidence in greater detail. As explained, we conclude that the commission proved all the allegations in Counts 3 and 4, and most of the allegations in Counts 5 and 6, by clear and convincing evidence.
1. Summary of alleged misconduct
Counts 3 through 6 arose in connection with respondent's relationship with the VTC probationer, BAS. BAS was accepted onto the Veteran's Treatment Docket in June 2013 after pleading guilty to felony DUII, and a condition of his probation was that he not possess firearms. Respondent acknowledged that condition, in his capacity as the VTC judge, on at least two occasions in fall 2013. During the holiday season and into January 2014, respondent had several out-of-court contacts with BAS, and he and BAS also texted back and forth multiple times. BAS also described two incidents in which respondent had been present and expressly had permitted BAS to handle a gun; according to BAS, during the second incident, respondent also had told BAS that he could make adjustments to BAS's probationary condition that prohibited handling firearms. Respondent *935 countered that, although the two were together on the occasions that BAS described, he had been either completely unaware that BAS had handled a gun or only inadvertently had become aware of that fact.
Later in August 2014, during a meeting with Judge Rhoades and Judge Penn, respondent denied having given BAS permission to handle a gun during the second incident; he also stated that he had not realized at the time that BAS was a felon. After that meeting, respondent self-reported **592 to the commission, and the commission's investigator later interviewed respondent. Respondent told the investigator in late 2014 that, during the second gun-handling incident, there had been no discussion about whether BAS should touch the gun.
The commission filed four counts in connection with the conduct summarized above, all of which alleged violations of Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). As to the Code of Judicial Conduct, in relation to the gun-handling incidents, Counts 3 and 4 also charged identical violations of the following rules:
"Rule 2.1 Promoting Confidence in the Judiciary
"(A) A judge shall observe high standards of conduct so that the integrity, impartiality and independence of the judiciary and access to justice are preserved and shall act at all times in a manner that promotes public confidence in the judiciary and the judicial system.
"* * * * *
"(C) A judge shall not engage in conduct that reflects adversely on the judge's character, competence, temperament, or fitness to serve as a judge."
Additionally, Count 5 alleged that respondent had engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of Rule 2.1(D), when he stated to Judge Rhoades and Judge Penn that he did not know BAS was a felon, and when he denied to the commission during its inquiry that he had "waived" BAS's firearms prohibition. And, Count 6 alleged that, in singling BAS out for attention and improperly imposing himself on BAS, and in placing BAS in the position of being subject to his attentions while being aware of his own control over BAS's probationary status, respondent had violated Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary); Rule 2.1(C) (prohibiting conduct reflecting adversely on judge's character to serve as judge); and Rule 3.7(B) (judge must be "patient, dignified, and courteous to litigants"). The commission **593 determined that respondent had violated all those rules and constitutional provisions as alleged.
2. Additional procedural facts
The procedural facts described below concern an issue that arose in connection with BAS's appearance as a witness and related events thereafter, which respondent argues should be considered in assessing BAS's credibility.
BAS did not live in Oregon in the months before the commission hearing or during the hearing. Before the hearing, respondent's counsel asked the commission's counsel a number of times about arranging to depose BAS, but he did not receive any definitive response. The commission's counsel, in turn, expected BAS to appear in person at the hearing, but learned the day before that he would not travel to Oregon and instead needed to appear remotely. At the hearing the next day, upon learning that BAS would not appear in person, respondent's counsel asked for the opportunity to depose him before he testified, but the commission denied that request. But, before BAS testified, the commission directed its counsel to email certain exhibits to him, to aid respondent's counsel's cross-examination. BAS then testified by telephone; however, he stated that he had not received the emailed exhibits, and respondent's counsel cross-examined him without those exhibits. Although the exhibits were not available for BAS's cross-examination, the commission did admit them into evidence. They included court documents relating to BAS's felony DUII conviction, plea, probationary conditions, custodial status, and Veterans Treatment Docket acceptance; and also several video clips of VTC courtroom *936 sessions in which BAS had appeared either in person or by telephone, usually before respondent, but sometimes before another judge.
After the commission filed its opinion with this court, respondent moved to supplement the record with continued deposition testimony of BAS. We granted that motion in part and ordered the parties to complete a cross-examination of BAS so that he could be questioned about the nontransmitted exhibits. Representatives for respondent attempted to contact BAS out-of-state and serve a subpoena on him, but **594 those attempts were unsuccessful. In the meantime, BAS obtained counsel, who twice arranged for BAS to voluntarily appear at an examination, but BAS did not appear.
Respondent then moved, in this court, to strike BAS's testimony from the record, and he relatedly argued that BAS "now has demonstrated numerous times throughout this proceeding that he is not reliable and his word is not trustworthy." We denied that motion, but we gave respondent leave to raise issues about witness credibility in his brief, which he has done. We consider that argument in our analysis of the evidence.
3. Analysis
a. Gun-handling incidents (Counts 3 and 4)
We begin our analysis of the gun-handling incidents by setting out some evidence that is undisputed. First, the record shows that, at VTC hearings in mid-October and early November 2013, respondent expressly told BAS that he was not allowed to possess or handle firearms. On the first occasion, as part of approving the opportunity for BAS to present a law-enforcement training, respondent stated to BAS, drawing courtroom laughter, "No guns. You don't get any guns." On the second occasion, in response to a jokingly asked question from BAS about whether he could touch a gun now, respondent emphatically answered, "No," again to courtroom laughter.
It also is undisputed that, a week after the second gun-handling incident, BAS told respondent's clerk that respondent and his son had brought a gun to his home, and she in turn told the VTC coordinator, Lambert. Lambert spoke to BAS that same day, and he told her about both incidents, as well other interactions with respondent. After they spoke, Lambert immediately documented their conversation, and her notes are in the record.
We turn to the other evidence. As noted, the first gun-handling incident (Count 3) occurred in mid-November 2013, at the home of respondent's son-in-law, Mansell. BAS had been hired to do some preparation work for a lacquer application on a large expanse of cabinetry that respondent and Mansell had built. The cabinetry contained three **595 concealed drawers, which Mansell often challenged visitors to find. BAS testified that respondent had showed him a corner cabinet, told him that it contained a secret compartment with a gun, and asked if he could find it. BAS continued that he did find the gun and asked respondent if he could handle it, and respondent gave him permission by answering, "yes, go ahead."[30] BAS then checked the gun and put it back. That testimony was consistent with BAS's earlier recounting of the incident, in mid-January 2014, to Lambert; he also had told Lambert that respondent had acknowledged his skill in finding the gun.[31] *937 For his part, respondent testified that he remembered Mansell and BAS working on a different side of the room from him, and that Mansell had said something to BAS about finding the hidden compartment. As he worked on the other side of the room, not paying attention, he heard Mansell make a comment that, he learned later, concerned an unloaded gun that BAS had found in the compartment.[32] **596 Mansell's testimony was consistent with respondent's-that is, that Mansell (not respondent) had challenged BAS to find any one of three hidden drawers and that BAS had searched for several minutes and found one that contained an unloaded gun. Mansell further testified that BAS had not touched the gun; instead, Mansell had made a comment to BAS about the gun, and then they closed the drawer. Mansell denied that respondent had seen the gun and stated, in response to questions from the commissioners, that respondent had been perhaps as much as 25 feet away when BAS found it.
The second incident (Count 4) occurred about seven weeks later, in early January 2014, when respondent and his son went to BAS's home to check his broken pellet stove. Unbeknownst to respondent, his son had brought a gun to show to BAS. BAS testified that, when respondent's son brought the gun inside, in its case, respondent was sitting about five feet away, eating his lunch. BAS watched respondent's son handle the gun and then asked respondent if he could demonstrate some safety features and safe handling techniques. Respondent said "no problem" and told BAS that, as the judge who had signed his probation order, he could make "adjustments" to his probation as he saw fit. BAS and respondent's son then handled the gun for 30 seconds to a minute. BAS also testified that, before respondent and his son left, BAS told respondent that he and respondent's son had plans to target-shoot later; respondent replied that he had no problem with BAS teaching a loved one how to shoot or handle their gun safely; and, later that day, BAS and respondent's son used the gun to target-shoot on BAS's property. That testimony was consistent with BAS's earlier, more immediate account to Lambert, in mid-January 2014. BAS also testified at the hearing that, while at his home, respondent had looked at the broken stove, but had not worked on it.
Respondent was the only other testifying witness who also had been present during the second gun-handling incident. At the hearing, the commission's counsel introduced testimony from respondent's earlier deposition. In that testimony, he described having been working on the stove, with "[his] hands in the pellets and the soot," when he "may have heard" BAS telling his son something that **597 prompted him to think that BAS was showing his son some sort of tactical maneuver. He then looked over and saw BAS with the gun, showing the maneuver to his son. Respondent further testified that he did not recall saying anything in response to seeing BAS with the gun and also did not think at that time about BAS's status as a felon; rather, his concern was trying to repair the broken stove. In his hearing testimony, respondent denied that BAS had asked his permission to handle the gun, denied having told BAS that he would waive BAS's firearms prohibition, and denied having known at the time about any plan for BAS and his son to go target-shooting.[33] *938 About a week after the second incident, BAS told respondent's clerk that respondent and his son had brought a gun to his home. She told Lambert, who then immediately spoke to BAS about that incident; Lambert also learned during her conversation with BAS about the first incident. Lambert then spoke to respondent. At the hearing, respondent stated that his conversation with Lambert was the first time that it had occurred to him that BAS was in felon status and that handling a gun could have negative implications for him, and that it had greatly concerned him. Soon thereafter, he told the VTC deputy district attorney, BAS's lawyer, and BAS's probation officer that his son had shown BAS a gun.
Several months after that, in August 2014, BAS and Lambert spoke again about BAS's frustrations with respondent, and Lambert then told Judge Rhoades about the gun-handling incidents and other issues involving BAS and respondent. Judge Rhoades spoke to BAS, which in turn prompted the meeting between Judge Rhoades, Judge Penn, and respondent, although respondent did not know the topic in advance and so was caught off-guard. Judge Penn described the meeting as Judge Rhoades beginning a line of **598 questioning and respondent providing initial answers, which respondent then clarified or modified after Judge Rhoades provided follow-up information. For example, respondent initially did not recall the second gun-handling incident at all; then, after Judge Rhoades provided some specific circumstances, he said, "oh yes, I do recall that." Neither Judge Rhoades nor Judge Penn thought that respondent was forthcoming. Respondent self-reported to the commission shortly after that meeting.
We must weigh the conflicting testimony about the gun-handling incidents to determine whether the commission proved by clear and convincing evidence that the facts occurred as BAS described, which in turn provides the basis for the alleged constitutional and rule violations set out in Counts 3 and 4. As with Count 2, we must consider witness credibility. See 362 Or. at 587-88, 413 P.3d at 932 (discussing topic); see also Trukositz , 312 Or. at 629, 825 P.2d 1369 (lawyer discipline; assessment of credibility is critical to resolving who is telling the truth, when testimony is notably divergent). We also consider objective factors, "such as the inherent probability or improbability of testimony, whether testimony is internally consistent or inconsistent, [and] whether the testimony is corroborated or contradicted." Fitzhenry , 343 Or. at 104, 162 P.3d 260.
In its opinion, in explaining its assessment of conflicting evidence on the BAS-related counts (Counts 3 through 6), the commission expressly found BAS to be credible. It first referred to several factors that did not relate to BAS's demeanor while testifying:
"BAS has no motive to lie. He received no benefit from testifying. In fact, some of his testimony was against his interest. BAS did not initiate a complaint against [respondent] with the Commission and clearly did not want to participate in these proceedings. Although BAS's concerns about repercussions for participating were evident, his testimony was consistent with his numerous prior interviews, the notes of which are in evidence."
Next, it referred to factors relating to BAS's demeanor and manner of testifying:
"[A]lthough he appeared by telephone, his demeanor was genuine, sincere, [and] heartfelt, and he displayed authentic emotion at appropriate times."
**599 As to Count 3, the commission also specifically found that BAS was "the most credible source" of information.[34]
*939 As did the commission, we give significant weight to BAS's testimony. First, we give weight to the commission's finding that, based on BAS's demeanor and manner of testifying, he presented genuinely and sincerely. See Schenck , 318 Or. at 420, 870 P.2d 185 (even on de novo review, court gives significant weight to factfinder's determination of witness credibility, when based on perception of witness's demeanor and particularly when factfinder stated basis for its conclusions). We acknowledge, as respondent posits, that the ability to visually observe a testifying witness can provide a factfinder with greater insight than a nonobservational setting, such as appearance by telephone. See generally State ex rel. Anderson v. Miller , 320 Or. 316, 323, 882 P.2d 1109 (1994) (so noting, in context of issuing peremptory writ directing that deposition be videotaped).[35] But, the commission was able to evaluate BAS's manner of expression as it listened to his testimony and separately questioned him. Other evidence in the record also supports his credibility, relating to his genuineness and sincerity in expression. For example, in video recordings of 14 of BAS's VTC appearances that are in the record, he presented as an earnest and forthright communicator, regardless of whether the circumstances were favorable to him or whether he appeared in person or by telephone. Also, the VTC deputy district attorney testified that he had observed BAS, in the context of his VTC appearances over the course of many months, to be credible and that the VTC team had found him to be very credible.
**600 Another factor supporting BAS's credibility, as the commission observed, is that his testimony about handling the guns was against his interest. By telling respondent's clerk and then Lambert a week after the second incident that he had handled a gun, BAS self-reported what appears to have been a violation of his own probation condition. We also think it significant that, after BAS described the gun-handling incidents to Lambert shortly after the second incident, she documented his account immediately, and that account was the same as described in his testimony. And, the record reveals that it is unlikely that BAS would have gone target-shooting with respondent's son without thinking that he had respondent's permission to do so.
Finally, at the time of the gun-handling incidents and up through the time when he spoke to Judge Rhoades, BAS was a probationer in respondent's court who was actively working to successfully complete his probation. Pressing an inaccurate, unfavorable account about his probationary judge's involvement in the gun-handling incidents would have been counterproductive to those efforts and could have placed BAS's probationer status at risk. Cf. Jordan II , 295 Or. at 156, 665 P.2d 341 (lawyer discipline; lack of motive to give incorrect testimony is factor to consider when evaluating witness credibility).[36]
Although we agree with the commission that BAS's testimony is entitled to significant weight, we acknowledge some countervailing considerations. For example, around the time of the incidents, BAS was undergoing treatment for PTSD and TBI, which the record shows are conditions that **601 can affect *940 thought processing.[37] Also, because BAS did not appear for the continued cross-examination that this court ordered, respondent was unable to fully cross-examine him, and BAS in turn demonstrated an unwillingness to be questioned any further.[38]
An additional consideration applies to the first incident (Count 3): Another witness, Mansell, provided testimony that supported respondent's account. Relatedly, BAS's testimony about that incident was brief, whereas Mansell's conflicting testimony was more detailed. Although that disparity aligns with the nature of the respective questioning of those witnesses, Mansell's more detailed account arguably suggests a more precise recollection of the events.[39]
If the only evidence supporting Count 3 were the conflicting testimony of BAS and Mansell, then we would have some difficulty concluding that the commission had proved the underlying facts on that count by clear and convincing evidence-stated differently, that BAS's version of the events was "highly probable." See Bishop , 297 Or. at 485, 686 P.2d 350 (lawyer discipline; when conflicting testimony is at issue, court must be "convinced that it is highly probable" that the testimony supporting the allegations is accurate);
**602 Jordan II , 295 Or. at 159, 665 P.2d 341 (lawyer discipline; where one witness had no motive to lie, but other witness's testimony had better corroboration, court was unable to determine whose testimony to believe; Bar therefore did not prove misconduct by clear and convincing evidence). That calculation is altered, however, when we also consider respondent's testimony, including on Count 4, and assess his credibility as a witness.
Respondent's testimony on Count 3 differed from BAS's in a few respects: it had been Mansell, not respondent, who had challenged BAS to find the hidden drawer that contained the gun, and respondent denied having given BAS permission to handle the gun. Respondent's testimony on Count 4, though, provided even more detail that contrasted with BAS's testimony-notably, that respondent had been actively working on the stove at the time, that his attention had been drawn to BAS showing his son a tactical maneuver, that he had said nothing at all to BAS about the gun, and that there had been no discussion about any target-shooting.[40] The number of opposing details surrounding the second incident suggests that either BAS or respondent was not being truthful about *941 that incident, as opposed to merely recalling it differently.
As to respondent's credibility, in connection with these proceedings, we already have determined that he provided certain information to the commission that has been refuted by other evidence. Specifically, concerning Count 2, respondent provided a detailed account of the events at a soccer game-notably including a description of having been physically accosted-which he reiterated at his deposition, in testimony introduced at the hearing. But, three eyewitnesses persuasively contradicted that account at the hearing. Respondent's course of continuing deceptive conduct undermines the credibility of his testimony about both the gun-handling incidents, notwithstanding Mansell's **603 supportive testimony on Count 3 or other evidence in the record that, as a general matter, respondent has a reputation for honesty in the community.
Respondent's evasive actions during his meeting with Judge Rhoades and Judge Penn also do not reflect well on his credibility. We acknowledge that respondent was caught off-guard in that meeting. Nonetheless, Judge Penn described respondent as clarifying or modifying his answers throughout the meeting, depending on the information that Judge Rhoades presented to him. Most significantly, respondent initially denied recalling the second gun-handling incident at all; but then, he acknowledged remembering it after Judge Rhoades provided him with some specific information. However, that second incident would not have been an incidental, forgettable event to respondent: He acknowledged in his own testimony that, within a week after it had occurred, he had spoken to Lambert about it; immediately became greatly concerned about potential negative implications for BAS; and then reported it to three members of the VTC team, including the deputy district attorney. Those facts counter his later assertion, during the initial part of his meeting with Judge Rhoades and Judge Penn, that he did not recall the incident. And, his otherwise evasive conduct during that meeting compounds his credibility problem.
Other facts refute another of respondent's assertions: that he did not think about BAS's felon status and related firearms prohibition until Lambert raised that issue with him after the second gun-handling incident. Most notably, only a week before the first gun-handling incident, respondent and BAS had jokingly interacted during an open VTC hearing about BAS's firearms prohibition. That interaction showed that, at that time, it was obvious to both of them that the prohibition applied. They had a similar interaction at a court proceeding a month earlier, which demonstrates an ongoing mutual understanding that a firearms prohibition applied to BAS.[41] In light of those interactions, it is apparent that respondent knew during both the **604 gun-handling incidents that BAS was subject to a firearms prohibition. His contention to the contrary further undermines his credibility.
In sum, we find BAS to be a credible witness and give significant weight to his testimony on Counts 3 and 4, for the reasons described. By contrast, the record does not reflect well on respondent's credibility. He previously provided false information to the commission in response to an official inquiry; his conduct during his presiding judge's inquiry about these incidents was evasive; and his protestations about not having an awareness at the critical time about BAS's felon status-and, thus, the applicable firearms prohibition-are contradicted by established facts in the record. We thus conclude that BAS's description of both gun-handling incidents was highly probable and that the commission therefore has proved by clear and convincing evidence the underlying facts alleged in its complaint on Counts 3 and 4. We now turn to the judicial conduct rules identified in those counts, as well as the applicable constitutional provisions.
Counts 3 and 4 alleged identical violations of Rule 2.1(A), which requires a judge to "observe high standards of conduct so that the integrity * * * of the judiciary * * * [is]
*942 preserved"; it further requires a judge to "act at all times in a manner that promotes public confidence in the judiciary." Those counts also alleged identical violations of Rule 2.1(C), which provides that a judge "shall not engage in conduct that reflects adversely on the judge's character * * * to serve as a judge." Preserving the integrity of and promoting public confidence in the judiciary assures the public "that certain types of conduct are improper and will not be tolerated." Schenck , 318 Or. at 438, 870 P.2d 185. Likewise, ensuring against conduct that reflects adversely on a judge's character assures litigants and the public that judges perform their judicial duties in an effective and honorable manner, and that they-like those who appear before them-are subject to applicable legal and other requirements. By affirmatively permitting a VTC participant in his court to handle a gun on two occasions, notwithstanding an applicable firearms prohibition, and in offering assurance that he, as the judge, could adjust that probationary condition, respondent violated those rules **605 as alleged. His conduct demonstrated to BAS that ordinarily applicable rules may not apply to a judge-and, by extension at the judge's discretion, to a probationer in the judge's court. That conduct undermines, rather than promotes, confidence in the judiciary.
Also in taking those actions, respondent acted willfully under Article VII (Amended), sections 8(1)(b) and (e) (prohibiting willful misconduct bearing a demonstrable relationship to the effective performance of judicial duties and willful violation of a judicial conduct rule). His conduct in permitting BAS to handle the guns was not inadvertent; rather, it was direct and, as demonstrated by his statements to BAS during the incidents, intentional. And, respondent was aware of circumstances that made Rules 2.1(A) and (C) applicable: During the gun-handling incidents, while interacting with an active probationer in his court, he affirmatively permitted that probationer to engage in conduct that his probationary terms prohibited. Because respondent acted willfully, his violations of Rules 2.1(A) and (C) were "wilful." Or. Const., Art. VII (Amended), § 8(1)(e). Those same actions also, as alleged, amounted to willful misconduct that "bears a demonstrable relationship to the effective performance of judicial duties." Id. at § 8(1)(b).
b. Misstatements during presiding judge meeting and investigator interview (Count 5)
Count 5 alleged two misstatements on respondent's part, relating to inquiries about the second gun-handling incident: First, his August 2014 statement to Judge Rhoades and Judge Penn that he had not known that BAS was a felon at the time of that incident; and, second, a responsive statement made to the commission, framed by the parties as a December 2014 purported statement to the commission's investigator, to the effect that he "denied" that he had told BAS that he "waived" the statutory provision against felons possessing firearms.[42] Based on those alleged misstatements, **606 Count 5 alleged a single violation of Rule 2.1(D) (prohibiting conduct involving dishonesty, deceit, or misrepresentation), as well as Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). In its opinion, the commission determined that respondent had made both misstatements and had violated the rule and section 8(1)(e) as alleged, but it made no recommendation as to section 8(1)(b).[43]
We begin with respondent's alleged misstatement to Judge Rhoades and Judge Penn. Judge Penn testified at the hearing that, during the August 2014 meeting, respondent had stated that he did not know *943 that BAS was a felon at the time of the second gun-handling incident, and Judge Penn did not think that that answer sounded truthful. Respondent countered in his testimony that, in making that statement, he had intended to convey that he had not realized during the incident-or had in his mind at that time-that BAS was a felon. Instead, he was focusing on BAS's broken stove and ensuring that BAS had a working heat source. He also emphasized at the hearing that he had been surprised by the questions being asked of him during the meeting and had been caught off-guard by the confrontational tone.
If we had accepted respondent's description of the gun-handling incidents-that is, that he had not been aware of the first incident and only inadvertently had become aware of the second incident as it was concluding-then we similarly might accept respondent's assertion that he did not have BAS's felon status in mind at the time of the second incident. But, we have determined that BAS's description of the incidents-not respondent's-is highly probable. BAS's description, in turn, supports a finding that respondent's statement to Judge Rhoades and Judge Penn about his awareness about BAS's felon status at the relevant time (and thus, the firearms prohibition) was not true. Most significantly, BAS testified that respondent had acknowledged his firearms prohibition during the second incident at BAS's home, but had told BAS that he could make "adjustments."
**607 Moreover, twice during VTC hearings that preceded both gun-handling incidents, respondent and BAS had publicly joked about BAS's firearms prohibition. The second of those occasions occurred shortly before the first gun-handling incident (at Mansell's home). Those repeated, joking references, occurring close in time to the first incident, showed that the firearms prohibition based on BAS's felon status was readily apparent to both respondent and BAS. Additionally, Judge Penn persuasively testified that respondent's statement during the meeting about BAS's felon status (and thus resulting firearms prohibition) did not seem truthful.
Having determined that respondent made a false statement about his lack of awareness concerning BAS's felon status during his meeting with Judge Rhoades and Judge Penn, we agree with the commission that he violated Rule 2.1(D), which prohibits a judge from "engag[ing] in conduct involving dishonesty, *** deceit, or misrepresentation."[44] We further agree that that violation was willful under Article VII (Amended), section 8(1)(e). Respondent made that misstatement notwithstanding having told BAS that he did not have a problem with BAS showing his son how to safely handle a gun and that he could make adjustments to BAS's probation conditions. And, he made that misstatement in the context of an inquiry from his presiding judge about whether any of his conduct-regarding his interactions with a VTC probationer-should be reported to the commission. That context supports the conclusion that respondent's misstatement was intentional and that he was aware of the circumstances that made Rule 2.1(D) applicable. See Jordan I , 290 Or. at 332, 622 P.2d 297 (by giving false testimony under oath-professing a lack of recollection about a certain event-judge engaged in willful misconduct in judicial office). In sum, clear and convincing evidence supports the alleged violations of Rule 2.1(D) and Article VII (Amended), section 8(1)(e), set out in Count 5.
We do not agree, however, that the record shows by clear and convincing evidence that respondent made a **608 second misstatement during his interview with the commission's investigator-specifically, that he falsely denied having told BAS during the second gun-handling incident that he "waived" BAS's firearms prohibition. The investigator testified only very briefly about that part of her interview with respondent, and she mentioned nothing about any purported waiver. Similarly, a memorializing report that she wrote at the time of the interview summarized respondent as simply having said that "[t]here was no discussion" during the second *944 gun-handling incident about whether BAS should touch the gun. The report did not state whether the investigator ever asked respondent about "waiv[ing]" the prohibition or what he may have told her in response. That factual allegation therefore does not factor into our conclusion that respondent violated Rule 2.1(D) and Article VII (Amended), section 8(1)(e), as alleged in Count 5.
c. Respondent's relationship with BAS (Count 6)
Count 6 concerned respondent's treatment of, and attention toward, BAS, particularly the multiple out-of-court contacts beginning in fall 2013 and continuing into early January 2014. That count alleged:
"[Respondent] singled BAS out for attention and improperly imposed himself onto BAS. [Respondent's] conduct put BAS in the position of being subject to [respondent's] attentions, while being aware of [respondent's] control over his probation status."
Based on that conduct, the complaint next alleged violations of Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary), Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge), and Rule 3.7(B) (judge must be patient, dignified, and courteous to litigants), as well as Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). The commission determined that respondent violated those rules and constitutional provisions.
The following facts relating to Count 6 have been proved by clear and convincing evidence. In September **609 2013, respondent asked permission to interview BAS for an article about the VTC that respondent was writing. BAS felt that he could not decline because he worried that declining might harm his case, and he did not want to get on respondent's "bad side," although he did not tell respondent that.
Then, over November and December 2013, and into January, respondent had several out-of-court contacts with BAS. In mid-November, respondent took BAS to a small, brief wedding ceremony that respondent had agreed to officiate, and he introduced BAS as a Navy SEAL and used his call sign. Although BAS's interactions with others at the wedding were polite and friendly, respondent's actions made BAS feel as if he were "on display" or an "exhibition piece." He did not share his discomfort with respondent. Later that month, respondent invited BAS to join his family for Thanksgiving dinner, but BAS declined because he was ill. Respondent's son took some of the food to BAS, and BAS texted his thanks to respondent. BAS and respondent had other text exchanges in that same time period.
In early December, respondent attended a VTC conference with Judge Prall, where they met friends of BAS's, including a famous Navy SEAL, and they learned more about BAS's military service. Respondent and Judge Prall also discussed appropriate boundaries between treatment court judges and participants; Judge Prall shared that, other than incidental greetings, she did not have out-of-court-interaction with participants. Respondent and BAS texted each other during the conference and later that month, while BAS was being treated for his TBI in Texas, and they texted each other holiday greetings on Christmas evening.
The day after Christmas, at respondent's invitation, BAS attended a family brunch to celebrate respondent's birthday. Respondent and his family tried to engage BAS in religious, military, and political discussions, and he felt uncomfortable and "backed up against the wall." Over the next few weeks, respondent and BAS texted back and forth about various topics. That continued into early January, through the week after the second gun-handling incident. In one of those exchanges, respondent offered to come and look **610 at the foundation of BAS's home, but BAS responded that he did not feel well, and he expressed feelings of personal negativity. Respondent texted back words of encouragement. Later that evening, respondent offered to bring BAS a working heat source the next day. BAS initially accepted, but then texted the next day that he would not be home and so respondent should not drive out. Respondent expressed concern that BAS was "disengaging," *945 but BAS assured him that he was not.
BAS expressed frustrations about respondent's out-of-court contacts with him to others, including his assigned taxi driver and respondent's clerk-and later to Lambert and, ultimately, Judge Rhoades. The driver testified that BAS acted differently outside of court because he could "let loose" and that it "fire[d] him up" a bit when he talked about respondent's authority over his probation. Lambert testified that BAS had told her, around mid-January 2014, that he felt "very distraught" by respondent's constant contact; that he felt "like [respondent's] monkey on a stick"; that he was being subjected to religious music and political talk; but that he thought that respondent would "mess him up" if he did not do what respondent wanted, including not reducing his felony sentence to a misdemeanor. She immediately memorialized those comments in her notes. The record also shows that BAS had out-of-court contacts with Judge Ochoa and other members of the treatment team, but those contacts had not concerned him; whereas, with respondent, he felt as though he were being "groomed" as an exhibition piece for the VTC. BAS did not share his frustrations with respondent.
For his part, respondent testified that, particularly during the 2013 holiday season, it had not occurred to him that he was placing BAS in a problematic position concerning his probation status, over which respondent presided. He had been focused, instead, on ensuring that BAS was socialized and protected against thoughts of depression and self-harm after returning to Oregon following his TBI treatment, at the start of the Christmas season. He therefore took actions that he thought were in BAS's best interests. We accept that testimony, but we agree with the commission that respondent also experienced a personal benefit of sorts **611 from his relationship with BAS, which may have motivated some of his conduct.[45]
Evidence in the record shows that, through the fall and early January, respondent and BAS had, by out-ward appearances, a friendly relationship. Their text exchanges-several of which BAS initiated-were pleasant and well-meaning, and their VTC hearing interactions were positive and forthright. Respondent stopped having out-of-court contact with BAS once Lambert told him that it made BAS uncomfortable. At a later point, their public interactions appeared to deteriorate, beginning when BAS's family-related circumstances deteriorated. By May 2014, BAS was in a more negative emotional state, and he and respondent had less than positive in-court interactions from that point forward, until his case was reassigned. At the commission hearing, respondent acknowledged that his out-of-court contacts with BAS had crossed appropriate boundaries and that, looking back, he would have relied on others to keep BAS from becoming isolated.
Turning to the rule violations alleged in Count 6, we agree with the commission that respondent's out-of-court contacts with BAS violated Rule 2.1(A) (judge must observe high standards of conduct to preserve the integrity and impartiality of, and promote public confidence in, the judiciary), and Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge). By singling BAS out for special and personalized treatment, respondent's conduct suggested to other VTC participants that a judge permissibly may develop a relationship with one probationer but not others and, in light of that relationship, treat that probationer partially as compared to others. And, although respondent's out-of-court contacts with BAS were generally well-meaning, they undermined public confidence in the judiciary and reflected adversely on his **612 character as a judge, because they placed BAS in the position of thinking that the successful completion of his probation depended on engaging in favorable out-of-court contact with respondent. *946 [46] In sum, respondent's conduct toward BAS-extending to his out-of-court contacts with BAS and his personal fascination with BAS's military experience, which, in turn, showed a personal benefit that respondent derived from the relationship-demonstrated a failure to exercise good judgment in recognizing appropriate judicial boundaries between a judge and a probationer in the judge's court.
We disagree with the commission, however, that respondent's out-of-court contacts with BAS violated Rule 3.7(B), which requires that a judge be "patient, dignified, and courteous to litigants" and other court participants-such as jurors, witnesses, lawyers, court staff, and others with whom the judge deals in an official capacity. Rule 3.7 as a whole governs courtroom decorum and judicial demeanor when acting in a judge's official capacity, as well as communications with jurors.[47] See generally Rule 3.7, Notes on Sources, printed in Oregon Rules of Court v I-State 516 **613 (2017) (Rule 3.7(A) is identical to ABA Model Code of Judicial Conduct Rule 2.8(A) ); ABA Model Code of Judicial Conduct Rule 2.8 Comment [1] (Feb. 2007) (duty to act with patience and courtesy connected to conducting court's business); see also Gustafson , 305 Or. at 666-67, 756 P.2d 21 (discussing alleged violations of canon requiring judge to be patient and dignified toward litigants during court proceedings). The allegations in Count 6 did not pertain to respondent's conduct in presiding over the VTC or toward BAS in the context of any VTC hearings or his case before the court, and we therefore conclude that no violation of Rule 3.7(A) occurred.
We next must determine whether, in violating Rules 2.1(A) and (C), respondent acted willfully under Article VII (Amended), sections 8(1)(b) and (e). As noted earlier, in Gustafson , 305 Or. at 660, 756 P.2d 21, this court explained that
"a judge's conduct is 'wilful' within the meaning of Article VII (Amended), section 8, if the judge intends to cause a result or take an action contrary to the applicable rule and if he [or she] is aware of circumstances that in fact make the rule applicable, whether or not the judge knows that he [or she] violates the rule."
In that case, which had involved a less-experienced judge, the court concluded that some of the judge's misconduct was willful and some was not. As an example of the latter, the judge had told a criminal defendant that his retained lawyer was not serving him well and then discharged the lawyer for failing to attend a hearing. This court determined that the judge had engaged in misconduct, implicating canons that required the judge to respect and comply with the law, to be patient with litigants and lawyers, and to ensure a defendant's right to be heard. But the court determined that the judge had acted without "the subjective culpability required for 'wilful' misconduct" because he had "suffered from a misconception" about his authority to discharge the lawyer. Id . at 664, 756 P.2d 21. The court similarly determined that the judge had not engaged in willful *947 misconduct when he had abused his discretion in a different case in denying a motion for continuance. The court explained that, although the judge had disregarded clearly legitimate reasons for granting the motion, the record did not show by clear and **614 convincing evidence "that he realized this or did so with an impermissible motive." Id. at 667-68, 756 P.2d 21. The court cited several other instances where the judge had taken case-related actions that either were without legal basis or were unreasonable and inconsiderate, but concluded that the record did not show that he had acted with any conscious awareness in that regard. Id. at 668-69, 756 P.2d 21. By contrast, the court found willful misconduct when the judge had interfered with an existing lawyer-client relationship and prevented more than one defendant from exercising the right to be heard through counsel, when he repeatedly had discharged a public defender due to his personal animus toward her. Id. at 665-66, 756 P.2d 21.
In Schenck , which also involved a less-experienced judge, the court again concluded that some of the judge's misconduct was willful and some was not. In one instance, the judge had taken actions that he thought were consistent with resolving a disqualification motion. The court explained that, even assuming that the judge should have recused himself for actual bias, "there is not clear and convincing evidence of the other necessary predicate, viz. , that [he] intended to cause a result or take an action contrary to the applicable rule of judicial conduct." 318 Or. at 413-14, 870 P.2d 185. In another instance, the court concluded that the judge had violated the canon prohibiting ex parte communications when he wrote to a justice of this court concerning a mandamus matter in which a writ had issued but the reconsideration period was still pending. The court concluded that the violation had not been willful because no clear and convincing evidence showed that the judge had been aware of circumstances that made the ex parte rule apply-rather, the judge had viewed the case as having concluded after the writ issued. Id. at 424, 870 P.2d 185.
By contrast, this court cited a different instance in Schenck where the judge had acted willfully. The judge had continued a case assignment even though the applicable canon required disqualification; this court reasoned in that circumstance that his denial of a motion to disqualify was sufficient to establish a willful violation. The court further explained:
**615 "Although the Judge argues that he acted in good faith, his asserted good faith in coming to the wrong conclusion [on a related timeliness issue] is not relevant to the determination whether [he] made an intentional decision that violated the canon."
Id. at 416, 870 P.2d 185 ; see also id. at 418-19, 870 P.2d 185 (providing additional example of willful misconduct).
Gustafson and Schenck -which, as with this case, both involved less-experienced judges-provide a useful backdrop for our evaluation of the evidence. Those cases show that a judge may engage in an intentional action that has the effect of violating a judicial conduct rule, but still may not amount to willful misconduct. Rather, to establish willful misconduct, the record must show by clear and convincing evidence that the judge intended to take the action that was contrary to the alleged rule violation and that the judge was aware of circumstances that made the rule applicable. Gustafson , 305 Or. at 660, 756 P.2d 21 ; Schenck , 318 Or. at 405, 870 P.2d 185.
We turn to the evidence about respondent's out-of-court contacts with BAS in fall 2013 through early January 2014. Those contacts certainly were intentional, as opposed to inadvertent. But, the central allegation in Count 6 is that, in engaging in those contacts, respondent "improperly imposed himself onto BAS" and "put BAS in the position of being subject to [respondent's] attentions, while being aware of [respondent's] control over his probation status." We must focus on that allegation, in determining whether respondent acted willfully.
We conclude that, before December 2013, respondent's conduct in engaging in out-of-court contacts with BAS was not willful, within the meaning of Article VII (Amended), sections 8(b) and (e), and in the context of the allegations set out in Count 6. Those *948 contacts had the reasonable effect of causing BAS to think that he should or must reciprocally engage with respondent, and they also reasonably could have conveyed to other VTC participants that respondent treated BAS in a partial manner. However, the record does not show by clear and convincing evidence that, before December, respondent had a conscious awareness about those dynamics. See Gustafson , 305 Or. at 659, 756 P.2d 21 (stating, in assessing a **616 judge's departure from prescribed norms of conduct, that "[i]t is not enough that a judge was negligent, that he 'should have known better' "). Rather, the record shows that respondent's intent in that timeframe was to ensure that BAS had the necessary support to successfully complete his probation and that he did not engage in self-harm.
In early December however, respondent and Judge Prall had a conversation about the boundaries between a treatment court judge and court participants, such as in the VTC. Judge Prall told respondent that, aside from an incidental out-of-court greeting, she did not have out-of-court interaction with any treatment court participant. At that point, respondent became aware of circumstances making Rules 2.1(A) and (C) applicable to his relationship with a VTC participant such as BAS. But, respondent's contacts with BAS continued; indeed, they increased and intensified over the next several weeks-both in the number of text exchanges and personal out-of-court contacts (such as the birthday brunch at respondent's home, respondent's early January visit to BAS's home, and respondent's subsequent plans to again visit him there). And, although the gun-handling incidents were not alleged as part of Count 6, respondent's conduct toward BAS during the second incident is illustrative of his willful actions toward BAS-as the commission alleged, that he improperly imposed himself on BAS and placed BAS in a position of being subject to his attentions, while being aware of his own control over BAS's probation status. For all those reasons, we conclude that the commission has proved by clear and convincing evidence that, beginning in December, respondent acted willfully, as set out in Article VII (Amended), section 8(1)(e), when he violated Rules 2.1(A) and (C). Moreover, that same conduct toward BAS-a probationer in the VTC over which respondent presided-amounted to willful misconduct in a judicial office that bore a demonstrable relationship to respondent's effective performance of his duties as the VTC judge, in violation of Article VII (Amended), section 8(1)(b).
C. Funding for "Heroes and Heritage Hall" (Count 9)
Count 9 concerned respondent's creation of a "Heroes and Heritage Hall" artwork and memorabilia **617 gallery at the courthouse. Among other things, the complaint alleged that, in collecting funds to professionally prepare and frame artwork from lawyers-including some who appeared before him in court-with donation checks delivered to him at the courthouse, respondent violated Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary) and Article VII (Amended), sections 8(1)(b) and (e) (willful misconduct bearing demonstrable relationship to effective performance of judicial duties; willful violation of judicial conduct rule). In its opinion, the commission determined that respondent had "sought and received money from attorneys," "solicit[ed] [their] financial support," and collected funds from them. That conduct, the commission continued, violated Rule 2.1(A) and the alleged constitutional provisions.[48] As explained below, we conclude that the commission did not prove Count 9 by clear and convincing evidence.
The record shows that, as the Hall artwork display expanded, various local lawyers-some of whom appeared before respondent- *949 inquired about it. Respondent spoke with some of them about sponsoring memorabilia pieces for particular well-known local lawyers and judges who were veterans. Each lawyer who had agreed to sponsor all or part of a memorabilia piece made payment by check paid to the order of a nonprofit foundation that had partnered with the VTC and then dropped off or mailed the check to respondent's chambers, or mailed it to the foundation's address. At the hearing, respondent denied directly soliciting funds from lawyers, and none of the lawyers who testified about making contributions stated that he had solicited funds from them. To the contrary, each lawyer testified that the lawyer had volunteered to sponsor certain memorabilia artwork and then had a conversation with respondent about the cost of framing and related arrangements. **618 Respondent's conduct in securing funds for certain artwork in the Hall from local lawyers, including having payments delivered to his chambers, had the potential of reflecting adversely on the judiciary in several respects. For example, it could have created a public perception of partiality toward lawyers who contributed or, conversely, created a perception that a noncontributing lawyer would not be treated favorably. The exchange of funds in the courthouse between respondent and lawyers who appeared before him, or payments for the nonprofit foundation otherwise sent directly by those lawyers to respondent, similarly could be perceived as undermining-rather than promoting-the public's confidence in judiciary. A better practice would have been for the foundation or some other organization, rather than respondent himself, to coordinate receipt of donations for a project such as the Hall.
We disagree with the commission, however, that respondent's conduct violated Rule 2.1(A), which requires a judge to observe high standards of conduct so that the integrity of the judiciary is preserved and also to act in a manner that promotes public confidence in the judiciary. The record shows that some lawyers inquired about sponsoring certain artwork, and respondent replied to those inquiries, sometimes served as a delivery point for payment to the foundation, and then arranged for the preparation and framing of the artwork. He neither directly sought out donations nor conveyed any possibility of differential treatment toward lawyers who contributed (or did not contribute). Respondent's conduct did not violate Rule 2.1(A); neither did it amount to willful violation of a rule under Article VII (Amended), section 8(1)(e), or willful misconduct in office bearing a demonstrable relationship to the effective performance of judicial duties under Article VII (Amended), section 8(1)(b). We dismiss Count 9.
D. Screening Process for Same-Sex Marriage Requests (Count 12)
1. Summary of alleged misconduct
Count 12 concerned respondent's direction to his staff to "screen" marriage requests from same-sex couples. Unlike almost all the other counts at issue, the underlying **619 facts are undisputed. Respondent made himself available to solemnize marriages after becoming a judge in fall 2011. After an Oregon federal district court judge invalidated Oregon's constitutional ban on same-sex marriage in May 2014, respondent's JA and his clerk asked him about any updated process, in light of his religious belief that marriage should be between only opposite-sex couples. He discussed with them how to "discreet[ly]" handle same-sex couple requests. He told them that, upon receiving any marriage request, they should check for any personal gender information available in OJIN-which they had not previously done-to try to determine whether the request involved a same-sex couple. If so, they should tell the couple that he was not available on the requested date or otherwise notify him, so that he could decide how to proceed. If the request were from an opposite-sex couple, however, then they should schedule the wedding date. Respondent's JA checked OJIN one time and determined that a requesting couple might be a same-sex couple, but respondent had an actual scheduling conflict, and so she truthfully told the couple that he was not available. Several weeks after that, respondent stopped solemnizing all marriages. Respondent's JA and other witnesses otherwise testified that they never had seen or known *950 respondent to discriminate against, or heard him speak in a derogatory way, about the LGBT community.
Count 12 alleged, as a factual matter:
"[Respondent] inappropriately screened and ordered his court staff to screen wedding applicants to ensure that they were not same-sex applicants, because [respondent] refused to marry same-sex partners even though they could lawfully marry under Oregon law."
That count went on to allege that respondent's conduct violated Article VII (Amended), sections 8(1)(b), (c), and (e) (prohibiting willful misconduct bearing a demonstrable relationship to the effective performance of judicial duties; willful or persistent failure to perform judicial duties; and willful violation of a judicial conduct rule), as well as Rule 3.3(B), which provides:
"A judge shall not, in the performance of judicial duties, by words or conduct, manifest bias or prejudice *** against **620 parties, witnesses, lawyers, or others based on attributes including but not limited to, sex, gender identity, race, national origin, ethnicity, religion, sexual orientation, marital status, disability, age, socioeconomic status, or political affiliation and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so."[49]
In its opinion, the commission made no recommendation as to Article VII (Amended), section 8(1)(c), but it otherwise determined that respondent's "discriminatory practice" violated Rule 3.3(B) and the remaining alleged constitutional provisions.[50] As discussed below, we agree that respondent's conduct violated Rule 3.3(B) and Article VII (Amended), sections 8(1)(b) and (e).[51]
2. Rule 3.3(B)
The parties, as well as amici curiae Christian Legal Society (CLS) and Hall, and Lambda Legal Defense and Education Fund, Inc., raise two questions about respondent's alleged misconduct, in light of the wording of Rule 3.3(B): First, whether he acted while in the performance of his "judicial duties," and, second, whether his implementation of a screening process-standing alone-"manifest[ed]" prejudice "against" anyone within the meaning of the rule. We address each question in turn.
We have little difficulty concluding that the act of solemnizing marriages, once a judge has chosen to do so, qualifies as a "judicial dut[y]" under Rule 3.3(B). Under ORS 106.120(2), a marriage in Oregon may be solemnized by a county clerk, an authorized clergyperson, certain religious congregations or organizations, and "[a] judicial officer." ORS 106.120(2)(a). ORS 106.120(1)(a) defines "judicial officer" as meaning, among other things, a "judicial officer of **621 this state as that term is defined in ORS 1.210." ORS 1.210, in turn, defines a "judicial officer" as "a person authorized to act as a judge in a court of justice." That statutory scheme authorizes a state court judge to solemnize marriages.
Of course, judges are not required to solemnize marriages. But, it is by virtue of holding judicial office that a judge is statutorily authorized to do so. It follows that, so long as a judge chooses to make himself or herself available to solemnize marriages under ORS 106.120(2)(a), that activity falls within the ambit of the judge's "judicial duties" under Rule 3.3(B). See Webster's Third New Int'l Dictionary 705 (unabridged ed. 2002) (defining "duty," in part, as "obligatory tasks *** or functions enjoined by order *951 or usage according to *** occupation[ ] or profession").
Amici curiae CLS and Hall emphasize that the essence of the judicial function involves deciding cases and controversies. See Koch v. City of Portland , 306 Or. 444, 448, 760 P.2d 252 (1988) (judicial function is one that involves or requires an adjudicatory process). In their view, the act of solemnizing a marriage-which serves the purpose of formally memorializing a marriage contract for the county's records-falls outside the scope of that function. That argument incorrectly focuses on the general concept of judicial "function," rather than a judge's judicial "dut[y]." The former refers to constitutionally authorized responsibilities that are "judicial" in nature, as opposed to executive, legislative, or otherwise. See, e.g. , DeMendoza v. Huffman , 334 Or. 425, 453-54, 51 P.3d 1232 (2002) (explaining legislature's authority to act in a way that does not unduly burden or substantially interfere with judicial function); State ex rel. Huddleston v. Sawyer , 324 Or. 597, 615, 932 P.2d 1145, cert. den. , 522 US 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997) (act of determining appropriate range of criminal sentences is legislative, not judicial, function); see also Couey v. Atkins , 357 Or. 460, 520-21, 355 P.3d 866 (2015) (explaining limits on "judicial power," such as court's lack of authority to provide advice to legislature without any form of judicial process). The latter term-which is used in Rule 3.3(B)-refers to the activities for which a judge is responsible, in his or her capacity as a judge. That range of responsibilities naturally includes deciding cases and controversies, **622 but it also encompasses other statutorily authorized activity assigned to a judge by virtue of holding judicial office.[52]
Once a judge chooses to make himself or herself available to the public to perform marriages as part of his or her judicial duties, Rule 3.3(B) prohibits the judge from "manifest[ing] *** prejudice *** against *** others," based on attributes including sexual orientation, or permitting staff to do so. Respondent next contends that, because he never actually refused to marry any same-sex couple by virtue of his briefly employed screening process, no prejudice or discrimination occurred toward anyone. He argues that Rule 3.3(B) does not authorize punishment for discrimination that did not occur against unknown parties.
We begin with the prohibition in Rule 3.3(B) that a judge may not "manifest" prejudice. "Manifest" is defined, in part, as "to show plainly : make palpably evident or certain by showing or displaying." Webster's at 1375. That definition suggests that the act in question must be undertaken such that it is obvious to others. Along those same lines, a comment to the underlying model rule suggests that "manifest[ing]" bias or prejudice means taking an action that must be capable of perception:
"Examples of manifestations of bias or prejudice include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics. Even facial expressions and body language can convey to parties and lawyers in the proceeding, jurors, the media, and others an appearance of bias or prejudice. A judge must avoid conduct that may reasonably be perceived as prejudiced or biased ."
ABA Model Code of Judicial Conduct Rule 2.3(B) Comment [2] (Feb. 2007) (emphasis added); see also Rule 3.3, Notes **623 on Sources, printed in Oregon Rules of Court v I-State 516 (2017) (Rule 3.3(B) adopted from ABA Model Code of Judicial Conduct Rule 2.3(B) ).[53] A requirement of perceptibility *952 by others is consistent with the purpose of the rule, which is to prevent a judge from acting in a way that impairs fairness or prompts unfavorable views of the judiciary. See ABA Model Code of Judicial Conduct Rule 2.3 Comment [1] ("A judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute."). To be perceptible, the conduct may be readily visible to others-for example, conduct displayed through spoken words or writing. But, a manifestation of bias or prejudice also may be discernable through actions that a judge may take over time, in the performance of his or her judicial duties, that demonstrate a pattern of bias or prejudice.
Respondent's screening process was designed to "discreet[ly]" handle same-sex marriage requests-specifically, to ensure that he married only opposite-sex couples, but without any same-sex couple, or anyone else outside his chambers, being made aware of the refusal. In that respect, his screening process was not displayed or made known in a manner that was capable of perception by members of the public-such as a same-sex couple seeking a marriage officiant.
However, respondent's chosen course of action-motivated by his intention to marry only opposite-sex couples-was evident to his staff. He directed his staff to check OJIN for gender information about each requesting couple, which they had not done before Oregon's constitutional same-sex marriage ban was invalidated. He then directed them to schedule opposite-sex marriages, but to either notify him about a potential same-sex marriage request, so that he could decide how to proceed, or to tell the requesting couple that he was not available. Those actions indisputably communicated to his staff his intention to **624 treat same-sex couples who requested a marriage officiant differently from opposite-sex couples. Moreover, he directed his staff to participate in that differential treatment, which included providing inaccurate information to same-sex couples. Those actions "manifest[ed]" prejudice in the performance of judicial duties, within the meaning of Rule 3.3(B).
Respondent next argues that, because no same-sex couple was refused the opportunity to marry as a result of his screening process, he did not discriminate or manifest prejudice "against" any such couple. Rule 3.3(B). While it is true that respondent's actions did not result in any actual refusal to marry a same-sex couple, for the reasons explained below, we nonetheless conclude that those actions manifested prejudice "against * * * others," within the meaning of the rule.
We reiterate that, in prohibiting a judge from manifesting prejudice against court participants or others based on personal attributes, Rule 3.3(B) seeks to prevent judicial actions that impair the fairness of a proceeding or prompt an unfavorable view of the judiciary. ABA Model Code of Judicial Conduct Rule 2.3 Comment [1]. Most commonly, problematic conduct likely would involve a judge's overt and prejudicial treatment of a particular person involved in a proceeding before the court-such as a litigant, juror, witness, or lawyer. See, e.g. , In re Ochoa , 334 Or. 484, 51 P.3d 605 (2002) ( Ochoa I ) (stipulated discipline for judge who violated former JR 2-110(B), based on his negative treatment of a criminal defense lawyer in a pending proceeding); see also ABA Model Code of Judicial Conduct Rule 2.3 Comment [2] (citing nonexclusive examples of prohibited conduct, such as using epithets or slurs, negative stereotyping, and irrelevant references to personal characteristics). However, a judge could manifest prejudice against others based on personal attributes in a more general way that still could affect perceptions of fairness or prompt an unfavorable view of the judiciary. For example, suppose that a judge made a generally disparaging racial remark during a court proceeding that was not directed toward any particular person. Such a comment nonetheless could prompt those who heard it to think that the judge might not act fairly in all instances or otherwise to view the judiciary in an unfavorable light.
**625 Similarly, if a judge engaged in a *953 pattern of endorsing or permitting racially motivated juror excusals, such a pattern could display prejudice, or the perception of prejudice, against a certain population based on race. Given the fundamental objective of Rule 3.3(B)-ensuring the public's trust in an impartial and fair judiciary-we conclude that that rule is not limited to a manifestation of prejudice against an identified, particular person. Rather, it may encompass an expression of bias against an identifiable group, based on personal characteristics, in the performance of judicial duties.
We return to the circumstances of this case. Respondent implemented a screening process with his staff, aimed at ensuring that he married only opposite-sex couples, which treated those couples differently from same-sex couples. That screening process demonstrated to respondent's staff that, in exercising his statutory authority and judicial duty to solemnize marriages, he would not treat all couples fairly. That conduct, in turn, manifested prejudice against same-sex couples, based on their sexual orientation, contrary to Rule 3.3(B).
3. Willful misconduct under Article VII (Amended), sections 8(1)(b) and (e)
We turn next to the question whether respondent acted willfully-that is, whether he intended to cause a result or take an action contrary to Rule 3.3(B), and whether he was aware of circumstances that made that rule applicable. Or. Const., Art. VII (Amended), § 8(1)(e); Gustafson , 305 Or. at 660, 756 P.2d 21. Relatedly, we must determine whether, if respondent acted willfully, his misconduct bore a demonstrable relationship to the effective performance of judicial duties. Or. Const., Art. VII (Amended), § 8(1)(b).
Respondent emphasizes that, rather than intending to discriminate against same-sex couples, he was trying to maintain the tenets of his faith. And, he continues, his staff similarly understood that the screening process was intended to allow him to continue to solemnize marriages of opposite-sex couples while adhering to his sincere and firmly held religious beliefs. He denies having acted with any discriminatory intent.
**626 The record shows that, in implementing the screening process, respondent intended to avoid scheduling marriages for same-sex couples, while continuing to schedule marriages for opposite-sex couples. He told his staff to begin to check OJIN for personal gender information about requesting couples; to treat couples differently based on sexual orientation; and to provide inaccurate information to same-sex couples. Although respondent may not have intended to violate Rule 3.3(B), he nonetheless proceeded with an intentional action-directing his staff to implement a screening process with the components just described, thereby subjecting same-sex couples to discriminatory treatment-that was contrary to that rule. See Schenck , 318 Or. at 416, 418-19, 870 P.2d 185 (circumstances surrounding judge's denial of motions for disqualification showed that judge acted willfully in violating applicable disqualification canon; given the circumstances, judge's asserted good faith in reaching wrong conclusion was not relevant to determining his intent). Relatedly, when respondent implemented that screening process, he was aware of circumstances that in fact made the rule applicable: His actions reflected an understanding that the Code of Judicial Conduct may have prohibited him from refusing to marry same-sex couples if he continued to marry opposite sex couples, and so he directed his staff to implement a screening process that permitted him to follow that course of action anyway, while avoiding public detection.
Finally, we conclude that respondent's willful misconduct bore a demonstrable relationship to the effective performance of his judicial duties, contrary to Article VII (Amended), section 8(1)(b). As explained, respondent chose to engage in the statutorily assigned judicial duty of solemnizing marriages. But, in carrying out that duty, he willfully manifested to his staff a bias against same-sex couples that undermined public trust in a fair and impartial judiciary.
4. Respondent's constitutional challenges
Respondent next argues that, if we determine that he engaged in the misconduct alleged in Count 12, we nonetheless must dismiss *954 that count because Rule 3.3(B) and Article VII (Amended), section 8(1), as applied in this case, **627 violate several provisions of the United States Constitution, as well as Title VII of the Civil Rights Act of 1964, 42 USC § 2000- 2000e-17. Those challenges-which he asserted below as affirmative defenses to Count 12-raise a series of important and complex issues, implicating the constitutional rights of individuals in respondent's position, as well as the rights of same-sex couples. Many of those same issues are currently being litigated in state and federal courts. See, e.g. , In re Neely , 390 P.3d 728 (Wy 2017), cert. den. , --- U.S. ----, 138 S.Ct. 639, --- L.Ed.2d ---- (2018) (imposing censure on judge who publicly refused to perform same-sex marriages); Craig v. Masterpiece Cakeshop, Inc. , 370 P.3d 272 (Colo Ct App 2015), cert granted , --- U.S. ----, 137 S.Ct. 2290, 198 L.Ed.2d 723 (2017) (bakery that refused to bake wedding cake for same-sex couple violated state public accommodation law; state's cease and desist order was not unconstitutional); Klein v. BOLI , 289 Or. App. 507, 410 P.3d 1051 (2017), petition for review pending (S065744, filed March 1, 2018) (similar holding; upholding violation and fine against bakery).
Ordinarily, as part of resolving the allegations at issue, we would proceed to analyze respondent's constitutional challenges. As explained in our discussion of the appropriate sanction below, however, two aspects of respondent's misconduct are sufficiently serious to warrant one of the most significant sanctions that this court has imposed in a judicial fitness proceeding: his repeated willful misstatements in the course of factfinding inquiries, and his conduct during the gun-handling incidents. We ultimately conclude, primarily based on that misconduct, that a three-year suspension is appropriate.
We return to respondent's misconduct that is at issue under Count 12. In light of the other, notably serious misconduct that the commission has proved by clear and convincing evidence, we conclude that-whether respondent's constitutional challenges are meritorious or not-our ultimate conclusion to impose a lengthy, three-year suspension remains the same. Because the misconduct at issue under Count 12 would not affect our consideration of the appropriate sanction, we need not consider respondent's constitutional challenges.
**628 V. SANCTION
This court explained the purpose of disciplining judges in Schenck , 318 Or. at 438, 870 P.2d 185 :
"Judges are disciplined primarily to preserve public confidence in the integrity and impartiality of the judiciary. Thus, disciplining judges serves to educate and inform the judiciary and the public that certain types of conduct are improper and will not be tolerated. Discipline of a judge also serves to deter the disciplined judge as well as other judges from repeating the type of conduct sanctioned."
See also Jordan I , 290 Or. at 335, 622 P.2d 297 (this court's duty and responsibility to impose sanctions for willful judicial misconduct maintains the citizenry's confidence in state courts and ensures that judges are honest and competent). Under Article VII (Amended), section 8(1), the available sanctions are censure, suspension, or removal from office.
The commission-which determined that respondent had engaged in multiple instances of willful misconduct in addition to those that we have concluded were proved by clear and convincing evidence-recommended removal from office. It determined that respondent's misconduct revealed several problematic patterns, including little insight about the boundaries required in a judicial position, actions taken for his own benefit, dishonesty, and poor judgment. The commission concluded that the nature of respondent's misconduct "call[ed] into question [his] competence and integrity," Schenck , 318 Or. at 441, 870 P.2d 185, and, when considered together with the purpose of judicial discipline and other applicable factors, justified removal.
Our conclusions about respondent's misconduct are not as extensive as the commission's. And, in any event, we consider the sanction question anew. For the reasons explained *955 below, we conclude that a suspension of three years without pay is appropriate.
In considering the appropriate sanction, we consider several criteria:
"(1) whether the misconduct was frequent and exhibited a persistent and pervasive pattern of behavior; (2) whether there was an exploitation of the judge's position **629 for personal interests; (3) whether there was an indirect economic detriment to the public; (4) whether the judge was experienced and familiar with the higher standards of conduct that apply to judges; (5) whether the misconduct adversely affected the public's perception of the integrity and dignity of the judiciary; and (6) whether there was a prior sanction."
In re Ochoa , 342 Or. 571, 576, 157 P.3d 183 (2007) ( Ochoa II ). We also consider the seriousness of the violations and the extent to which respondent has demonstrated an interest in avoiding similar problems in the future. Schenck , 318 Or. at 438, 870 P.2d 185. And, we consider any other circumstances that may guide our determination of the appropriate sanction. See id. at 416, 870 P.2d 185 (judge's purported good faith in taking prohibited action appropriately considered as part of sanction determination).
Several aspects of respondent's willful misconduct exhibited a persistent and pervasive pattern of behavior. First, he has engaged in a pattern of making false statements in response to inquiries about his conduct-to the commission during an official inquiry in early 2013 (about a purported physical altercation at the second soccer game) and to his presiding judge in August 2014 (about his awareness of BAS's felon status during the second gun-handling incident; he also made other evasive statements during that meeting). Those instances of misconduct show a repeated effort on respondent's part to provide false information with the goal of self-protection and avoidance of personal responsibility, for his own benefit. Second, respondent's false statement to the commission in early 2013, his involvement in the two gun-handling incidents, and his other inappropriate out-of-court contacts with BAS from December 2013 to early January 2014 demonstrate a persistent pattern of engaging in conduct that reflects adversely on his character to serve as a judge. Third, through his inappropriate out-of-court contacts with BAS, and also during the gun-handling incidents, respondent engaged in a pattern of behavior that undermined the integrity of, and public confidence in, the judiciary. That conduct involving BAS, however, occurred within a defined period of time, lasting no more than two months, and the inappropriate out-of-court **630 contacts ended when respondent learned that they made BAS uncomfortable.[54]
We consider two aspects of the respondent's misconduct to be particularly serious. The first is that respondent willfully provided multiple false statements during factfinding inquiries: one to the commission (in early 2013) during an official inquiry, which included an untruthful accusation against another person; and one to his presiding judge (in August 2014) during her effort to determine whether she had an obligation to report certain conduct to the commission for investigation. That pattern of false statements suggests that respondent is not trustworthy. See Jordan I , 290 Or. at 336, 622 P.2d 297 (judge who had made false statement under oath impugned his honesty and integrity as a judge). Further, it negatively affects his ability to serve in a court system that foundationally depends on truthful statements. See Field , 281 Or. at 637, 576 P.2d 348 (the public's impressions during daily interactions with the courts "serve[s] to shape their opinion of the judicial system, our laws and law enforcement"; the court "cannot permit that opinion to be anything but one of confidence *956 and respect" (internal quotation marks omitted) ).
We view as equally serious respondent's willful conduct toward BAS during the gun-handling incidents. On both occasions, while knowing that BAS was subject to a statutorily required firearms restriction, respondent affirmatively permitted BAS to handle a gun. On the second occasion, respondent told BAS that he could make adjustments to that restriction because he was responsible for overseeing BAS's probation and added that he had no problem with BAS going target-shooting with his son. Aside from any potential safety concern that might have arisen in **631 such circumstances,[55] that conduct undermined the integrity of the judiciary and respondent's character as a judge: It suggested to BAS that his probation conditions were both flexible and enforceable based on respondent's own whim. And, respondent's conduct placed BAS at legal risk for being in violation of his probation and potentially subject to criminal charges.
Another factor to consider is that, at the time of the events at issue, respondent had not been subject to any earlier sanction, and he was not a particularly experienced judge. See Gallagher , 326 Or. at 288, 951 P.2d 705 (lack of any prior complaint weighed against imposing more serious sanction); Gustafson , 305 Or. at 669-70, 756 P.2d 21 (acknowledging judge's inexperience). Respondent's inexperience as a judge, however, bears on only our evaluation of his inability to maintain appropriate boundaries in his interactions with BAS outside of court. In that respect, respondent's inexperience reduces the weight that we give to that violation. His inexperience does not excuse his more serious violations-his failure to tell the truth, and his conduct during the gun-handling incidents. Any judge, regardless of his or her experience, should understand and readily comply with the obligation to make truthful representations during a factfinding or similar inquiry. The same is true regarding respondent's conduct toward BAS during the gun-handling incidents and the fair and impartial treatment of probationers: Regardless of experience, a judge should know not to participate in conduct that is contrary to a probation condition or to suggest that individual probation terms are flexible or conditional, based on the judge's individual actions that are undertaken independent of the facts of the case and applicable law.
The final factor for our consideration is the extent to which respondent has demonstrated an interest in avoiding **632 similar problems in the future. Regarding his inappropriate out-of-court contacts with BAS as a general matter, respondent has acknowledged that he overstepped boundaries that he should have maintained with a VTC participant in his court and that he would now approach that situation differently. As to the other misconduct, however, respondent has denied any wrongdoing and, as explained at length in this opinion, has proffered accounts of various events that differ from clear and convincing evidence in the record.
Under Article VII (Amended), section 8(1), we may censure respondent, suspend him, or remove him from office. Censure may be appropriate for judicial misconduct directly related to the judge's official performance if we have "no reason to think that the incidents will be repeated or that the [judge] requires any greater sanction than the publication of [an] opinion and the publicity attendant to [the] proceeding." Schenck , 318 Or. at 442, 870 P.2d 185 (internal quotation marks omitted). For example, in Gustafson , 305 Or. at 669, 756 P.2d 21, this court considered the appropriate sanction for an inexperienced judge who had engaged in multiple willful rule violations, including rules pertaining to public confidence in the judiciary *957 and impartiality; improper interference with lawyer-client relationships; and impatient, undignified, and discourteous behavior toward lawyers and litigants. The court emphasized the judge's missteps and noted that he had been "slow to recognize that his conduct in office fell short of judicial standards," but then acknowledged that he apparently had "undertaken steps to learn from his unfortunate start." Id. at 670, 756 P.2d 21. The court saw no need for, or useful purpose to be served by, a suspension and instead imposed a censure. Id.
A suspension may be appropriate if a judge engages in misconduct directly related to the judge's official duties, when the record shows that the judge does not "view[ ] the future in a manner materially different from the past"-that is, when the judge lacks genuine reflection, any acknowledgement of wrongdoing, and a willingness to change course. Schenck , 318 Or. at 443, 870 P.2d 185. Depending on the misconduct at issue, a suspension also may be necessary "to maintain public confidence in the integrity and impartiality of the judiciary that demands adherence to the standards of conduct [that] it has set for itself and for the fair administration of **633 justice." Id. And, suspension-rather than removal-may be appropriate when the judge's integrity is not "directly called into question," Id. at 442, 870 P.2d 185, but the misconduct nonetheless "adversely affect[s] the public's perception of the integrity and dignity of the judiciary." Ochoa II , 342 Or. at 576-77, 157 P.3d 183. A suspension may be with or without pay. Schenck , 318 Or. at 437-38, 870 P.2d 185 ; ORS 1.430(4) (if judge suspended, salary shall cease if so ordered).
Schenck provides an example of misconduct that justified a suspension. The judge in that case-who, as with the judge in Gustafson , was not very experienced-engaged in willful misconduct when he refused to disqualify himself in cases in which his impartiality might be questioned; initiated ex parte communications about pending cases; and published comments about pending cases and his negative views about the local district attorney. Unlike in Gustafson , the judge in Schenck did not acknowledge any wrongdoing; to the contrary, he asserted that all his challenged conduct complied with judicial conduct obligations. 318 Or. at 439, 870 P.2d 185. The court recognized that the judge was entitled to vigorously defend his legal position and that asserting such a defense should not be construed as implying a lack of understanding about the problematic behavior or of any intent to correct it. But, as to one of the instances of misconduct, the court "confess[ed] a genuine concern about the Judge's resolve either to understand the true nature of such problems or to avoid them in the future." Id. at 440, 870 P.2d 185. The court imposed a 45-day suspension from office without pay. See id. at 443, 870 P.2d 185 (imposing suspension and stating that "[t]here are important lessons to be learned from this case, and we are convinced that a suspension of the Judge without pay is the only way to ensure that he will learn those lessons").
In another case, Gallagher , this court imposed a longer suspension on an experienced judge who regularly required his JA to help him with campaign fundraising and other noncourt work; used state-paid property and equipment to those same ends; and used his position as a judge to try to gain financial advantages for himself and others. The court observed that much of the judge's misconduct was frequent and "formed a persistent and pervasive pattern of behavior," while other misconduct showed an exploitation **634 of his judicial position "to satisfy personal desires." 326 Or. at 288, 951 P.2d 705. The court also emphasized that, as an experienced judge, he was "well familiar with the high standards of behavior that the privilege of judicial service demands" and that his conduct "adversely affect[ed] the public's perception of the integrity and dignity of the judiciary." Id. After considering all those factors, the court imposed a six-month suspension without pay. Id.
Removal from office is appropriate when "a series of misconduct incidents calls into question" the judge's integrity or competence. Schenck , 318 Or. at 441, 870 P.2d 185. Removal depends on "the magnitude of the violation"; also, "if the violation is likely to *958 recur, removal may be appropriate, depending on the totality of the circumstances." Id. (internal quotation marks omitted; emphasis added). This court has ordered the removal of a judge in two cases, one of which- Jordan I -bears on our consideration of the sanction in this case.[56] The judge in Jordan I had, over a two-year period, violated multiple canons of judicial ethics. Much of his misconduct involved treating defendants, lawyers, and jurors in a negative fashion, engaging in ex parte communications and other misconduct, and performing various judicial duties in an incompetent manner. 290 Or. at 332-34, 622 P.2d 297. More notably, however, the judge came under scrutiny for his collaboration with a county corrections official, relating to the prosecution of some inmate work crew members who purportedly had vandalized county property. On the day that the vandalism occurred, the judge spoke to the official about it, and the official then signed a criminal complaint. The next day, the judge and the official spoke outside of court, and outside the presence of the inmates or their counsel. They agreed on a process for the judge to summarily arraign the inmates on the vandalism charges, accept their pleas, and sentence them to certain terms; the judge then took those actions. **635 A disciplinary proceeding later was initiated against the official, and the judge was called as a witness. He testified under oath that he did not recall ever having a conversation with the official on the day that the vandalism occurred. Id. at 308-10, 622 P.2d 297. As to the judge's collaboration with the official about the inmates' cases, this court concluded that the judge had allowed himself to be improperly influenced by the official and had violated a judicial canon that provided that a judge should accord every litigant, and his or her lawyer, the full right to be heard according to law. Id. at 319-20, 622 P.2d 297. As to the judge's testimony in the official's disciplinary hearing, this court concluded that the judge had knowingly made a false statement under oath, which amounted to willful misconduct bearing a demonstrable relationship to the judge's effective performance of his judicial duties. Id. at 315, 622 P.2d 297. Additionally, that misconduct violated the judicial canon that a judge should respect and comply with the law, and conduct oneself at all times in a manner promoting public confidence in the integrity and impartiality of the judiciary. Id. at 315-16, 622 P.2d 297. The court specifically observed that the judge's false statement under oath had "impugn[ed] his honesty and integrity." Id. at 336-37, 622 P.2d 297. Ultimately, the court determined that the judge's misconduct and incompetence, coupled with his lack of candor and honesty, as well as the protracted nature of his collective misconduct over a sustained period of time, required his removal from office. Id. at 332-37, 622 P.2d 297.
In this case, if the only misconduct at issue were respondent's inappropriate contacts with BAS outside of court, excluding the gun-handling incidents, censure would be the appropriate sanction. Those contacts showed that respondent had difficulty understanding appropriate boundaries between a judge and a court probationer, and they reflect a failure to exercise sound judgment. However, those contacts occurred over a defined, relatively short timeframe; respondent's actions toward BAS were largely motivated by a genuine desire to provide BAS with support; and, when respondent became aware that BAS was not comfortable with the contacts, he stopped engaging in them. Additionally, respondent acknowledges that his actions toward BAS crossed appropriate judicial boundaries and that he would now handle the situation differently, such as **636 relying on other VTC team members to reach out to a struggling participant.
Those are not the only violations at issue, however. As explained, respondent's misconduct in making willful misstatements to the commission in the course of an official inquiry *959 and to his presiding judge during her inquiry about BAS, as well as his misconduct involving BAS during the gun-handling incidents, is exceptionally serious. He falsely accused another person of assaulting him, and he otherwise acted dishonestly and for his own self-benefit. His misconduct suggested a character that reflected poorly on his fitness to serve as a judge and his ability to exercise sound judgment.
Considering the record as a whole, the nature of respondent's misconduct was far more serious than the misconduct at issue in Gustafson , 305 Or. 655, 756 P.2d 21, in which the judge was censured; Schenck , 318 Or. 402, 870 P.2d 185, in which the judge received a 45-day suspension; and Gallagher , 326 Or. 267, 951 P.2d 705, in which the judge received a six-month suspension. Although respondent's misconduct did not involve an exploitation of his judicial position, as in Gallagher , 326 Or. at 287, 951 P.2d 705, it demonstrated repeated, serious misjudgments concerning a vulnerable probationer in his court, as well as repeatedly providing false information for the sake of self-protection. Unlike those cases, this case requires at least a lengthy suspension-far longer than any suspension imposed in any prior case; stated differently, a more significant sanction than any previously imposed, short of removal from office.
We do not think, however, that removal is appropriate. Respondent's misconduct-as we have found by clear and convincing evidence-did involve willful misrepresentation and other conduct that that certainly reflected adversely on his character to serve as a judge. But, it falls somewhat short of the more severe problematic misconduct at issue in Jordan I , 290 Or. 303, 622 P.2d 297, for which the court removed that judge from office.[57]
**637 We conclude that a lengthy suspension is required, to preserve public confidence in the integrity and impartiality of the judiciary. After considering respondent's willful misconduct that the commission proved by clear and convincing evidence, the applicable factors in ascertaining the appropriate sanction, and the totality of the circumstances, we impose a three-year suspension without pay as the appropriate sanction.
Respondent is suspended from his judicial office without salary for a period of three years, commencing upon entry of the appellate judgment.

As summarized later below, Count 2 alleged a violation of Article VII (Amended), section 8(1)(e), only. All the other counts at issue alleged violations of both sections 8(1)(b) and (e), and Count 12 also alleged a violation of section 8(1)(c).
Other parts of Article VII (Amended), section 8(1), grant similar authority to this court to censure, suspend, or remove a judge for certain conduct that is not willful, but those provisions are not at issue in this case. See id. at § 8(1)(a) (conviction of certain crimes); (d) (general incompetent performance of judicial duties); (f) (habitual drunkenness or illegal use of certain drugs).

We discuss in detail below the particular rules set out in the Code of Judicial Conduct that the commission determined respondent to have violated in this proceeding.

Of course, the voters also may "remove" a judge by declining to reelect the judge to a new term. See Or. Const. Art. VII (Amended), § 1 (state court judges shall be elected by voters to six-year terms); see also id. at § 2 (cross-referencing the authority of voters to recall public officers, set out in Article II, section 18).

We do not describe facts relating to the five counts that the commission recommends be dismissed. The commission does not ask us to revisit those counts in this court; we therefore limit our consideration to the violations that the commission found, and we dismiss the remaining counts. See Gallagher , 326 Or. at 284, 951 P.2d 705 (although the court has authority to consider all matters charged, it may choose to limit its consideration to only the commission's determined violations).
We also do not describe facts that relate to immaterial matters or evidence that, in our judgment after reviewing the record, carries little to no weight.

The commission also determined, under Count 2, that respondent had violated the identified rules when he reported to the commission that, after the first game, he had produced his business card only upon request. Count 2 did not, however, allege any facts about that statement; it concerned only respondent's statement about having been physically accosted after the second game.

DUII is a Class C felony if the defendant already has been convicted of DUII at least two times in the 10 years prior to the date of the current offense. ORS 813.011(1). Otherwise, DUII is a Class A misdemeanor. ORS 813.010(4).

ORS 166.270(1) makes it a crime for a felon to possess a firearm.

SEAL is an acronym for the United States Navy's sea, air, and land special operations force.

Respondent has two sons; one son became involved with BAS in 2013, and the other had played on the Chemeketa soccer team in 2012.

At the hearing, BAS was not asked whether the gun had been loaded. He previously had stated, in an interview with the commission's investigator about a year earlier that had not been conducted under oath, that the gun had been loaded.

During the hearing, BAS was not asked whether the gun had been loaded when respondent's son brought it into his home. Of course, the gun was loaded later, when BAS and respondent's son used it for target-shooting.

It was a common VTC practice to order paper-writing as a sanction for violating a term of a hearing order.

Count 9 also alleged a violation of Rule 2.1(C) (prohibiting conduct reflecting adversely on judge's character and fitness to serve as judge), apparently concerning related factual allegations about whether respondent had permission to hang the artwork, his initial public identification of paying sponsors, and the nature of one framed collage. That collage included a painted portrait of Adolf Hitler that had been cut from a frame at the end of World War II by a local veteran serving in Germany. In the collage, the portrait was partially covered by World War II-era photographs, letters, and memorabilia from the veteran, and it was surrounded by photographs of American soldiers during the war, medals awarded to the veteran, and other memorabilia.
Notwithstanding those additional factual allegations in the complaint, the commission in its opinion focused on only the collection allegation under Rule 2.1(A), and it made no recommendation as to Rule 2.1(C). We similarly narrow our consideration of Count 9.

Under ORS 106.120(2)(a), a marriage in Oregon may be solemnized by "[a] judicial officer." (Other authorized persons or entities-county clerks, certain religious congregations or organizations, and authorized clergypersons-also may solemnize marriages, ORS 106.120(2)(b)-(d).) ORS 106.120(1)(a) defines "judicial officer" as meaning, among other things, a "judicial officer of this state as that term is defined in ORS 1.210." ORS 1.210, in turn, defines a "judicial officer" as "a person authorized to act as a judge in a court of justice."

At the time of these events, the Oregon Judicial Information Network (OJIN) was the Oregon circuit courts' case register system that was in use in Marion County. It contained a register of events for cases filed in the Oregon circuit courts, with additional information about case parties.

The commission made no finding on the alleged violation of Article VII (Amended), section 8(1)(c) (willful or persistent failure to perform judicial duties).

The commission determined that respondent violated the following rules, in addition to those alleged:
• Count 2 (false statement in response to soccer-related inquiry): Rule 3.12(A) (not being candid with disciplinary authority);
• Counts 3 and 4 (BAS gun-handling incidents): Two violations each of Rule 2.1(B) (prohibiting commission of criminal act) and Rule 3.9(A) (prohibiting ex parte communications);
• Count 5 (presiding judge and commission inquiries about BAS gun-handling incidents): Rule 2.1(C) (prohibiting conduct adverse to character to serve as judge); Rule 3.12(A) (not being candid with disciplinary authority);
• Count 9 (Heroes and Heritage Hall): Rule 4.5(A) (prohibiting personal solicitation of funds); and
• Count 12 (screening process for same-sex marriages): Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary); Rule 2.1(D) (prohibiting conduct involving dishonesty, deceit, or misrepresentation).

The commission argues that respondent had notice of some of the unalleged charges because its counsel noted in her hearing memorandum that some particular additional rules might be in play. A general reference to unalleged rule violations in a hearing memorandum is insufficient notice.

Other than a claim preclusion argument that we briefly address below, the parties' contentions-and, accordingly, our analysis-are confined to the scope of the commission's authority to act under its rules.

ORS 1.420 provides, in part:
"(1) Upon complaint from any person concerning the conduct of a judge or upon request of the Supreme Court, and after such investigation as the Commission on Judicial Fitness and Disability considers necessary, the commission may do any of the following:
"(a) The commission may hold a hearing pursuant to subsection (3) of this section to inquire into the conduct of the judge.
"(b) The commission may request the Supreme Court to appoint three qualified persons to act as masters, to hold a hearing pursuant to subsection (3) of this section and maintain a record on the matter referred to them and to report to the commission on the conduct of the judge.
"(c) The commission may allow the judge to execute a consent to censure, suspension or removal."

CJFDRP 7 provides, in part:
"INVESTIGATION AND DISPOSITION
"a. Preliminary Investigation
"The Commission, upon receiving information indicating that a judge's behavior may come within the purview of Section 8, Article VII (amended) of the Constitution of the State of Oregon, shall make such investigation as it deems necessary to determine whether formal proceedings should be instituted and a hearing held. The Commission may make such investigation on its own motion. ***
"b. Inquiry of Judge
"The Commission's investigation may include a written inquiry directed to the subject judge requesting information on the allegations contained in the complaint. The purpose of the inquiry shall be to develop basic information regarding the complaint in order to assist the Commission in evaluating the merits of the complaint. ***
"c. Informal Disposition
"If the investigation reveals a departure by the judge from the Code of Judicial Conduct which is not sufficiently serious to warrant a public hearing under Rule 8, the Commission may, by conference or communication, make the judge aware of the objectionable conduct and shall dismiss the complaint. ***
"d. Formal Disposition: Notice
"If the investigation reveals a departure by the judge from the Code of Judicial Conduct which may warrant censure, suspension or removal, the Commission shall notify the judge of the investigation, the nature of the charges, and the Commission's intent to issue a formal complaint under Rule 8. *** The judge shall be afforded reasonable opportunity to make a statement in writing explaining, refuting or admitting the alleged misconduct ***. ***
"e. Dismissal
"At any stage in the proceedings, if the investigation discloses that there is not sufficient cause to warrant further proceedings, the case shall be dismissed. If the judge has been notified of the pendency of the complaint, the judge shall be provided notice of the dismissal."

As noted, the misconduct alleged in Count 1 involved the brief interaction between respondent and Deuker, which the commission alleged had violated Rule 2.1(A) (preserving integrity of judiciary; promoting public confidence in judiciary), Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge), and Rule 2.2 (prohibiting using judicial position for personal advantage). We do not mean to suggest that an alleged violation of any of those rules is less serious than a violation of other rules. Rather, we observe only that the factual allegations under Count 1-for example, as compared to other factual allegations in this case that involve some of the same rules-did not allege misconduct of a significantly serious nature.

The parties have disputed whether the concept of dismissal "with prejudice" applies, but we think that that argument misses the mark. A dismissal "with prejudice" or "without prejudice" applies once a formal proceeding has been instituted-which, in a judicial fitness proceeding, is upon the filing of a formal complaint. See generally CJFDRP 7.a. (investigation phase determines whether formal proceedings should be instituted); CJFDRP 8 (governing "formal proceedings," commenced with filing complaint); CJFDRP 17.g. (once formal proceeding instituted, dismissal "without prejudice" is required when judge resigns or retires during pendency of prosecution, "which means that it may be revived if the judge resumes a judgeship"); see also ORCP 54 A, B (specifying various circumstances when dismissal of an "action" is "with prejudice" or "without prejudice"); ORS 18.082(3) (entering general judgment has effect of dismissing with prejudice claims for relief set out in complaint or petition, unless court notes dismissing without prejudice). In this circumstance, where no formal proceeding had yet been instituted, the commission's mutually exclusive dispositional options are governed by CJFDRP 7.

Respondent argues that the doctrine of claim preclusion prohibited the commission from bringing Count 2. We disagree that that doctrine-even assuming that it applied when formal proceedings had not yet been initiated-prevented the commission from alleging Count 2. As explained, the commission's 2013 dismissal under CJFDRP 7.e. pertained to the initiating complaints about respondent's conduct toward the soccer officials, not the alleged misstatement in his response letter. Claim preclusion does not apply in that circumstance. See Drews v. EBI Companies , 310 Or. 134, 140, 795 P.2d 531 (1990) (plaintiff who prosecuted one action against a defendant through to a final judgment was precluded from prosecuting another action against the same defendant, when, among other conditions, "the claim in the second action is one which is based on the same factual transaction that was at issue " in the first action (internal quotation marks omitted; emphasis added) ).

ORAP 11.27(2)(b) requires the commission to commence a judicial fitness proceeding in this court by filing its recommendation, together with a record of its proceedings below. The judge then files an opening brief, and the commission files an answering brief. Respondent asserts that that rule unconstitutionally required him to bear the burden of proof in this proceeding, in which no final adjudication has yet occurred.
CJFDRP 7.a. governs the commission's preliminary investigation and authorizes it to "make such investigation as it deems necessary to determine whether formal proceedings should be instituted and a hearing held." Respondent asserts that, in this case, the commission's broad-ranging authority under that rule impermissibly led it to hire an inexperienced investigator and it then based its entire case on the faulty investigation.
CJFDRP 11.c. provides that, upon written request of the commission's counsel or the judge, the commission may order that material witness testimony be taken by deposition and, if the witness is unwilling to appear, may issue a subpoena. Respondent argues that he was unable to depose a key witness, BAS, and also unable to obtain certain discovery, amounting to an unconstitutional denial of his opportunity to be heard.
CJFDRP 13.e. provides that, at the hearing, the judge shall have the right and reasonable opportunity to defend against the charges by introducing evidence and examining and cross-examining witnesses. Respondent challenges the commission's exclusion of certain impeachment evidence regarding BAS; again notes his own inability to depose BAS pretrial; and also notes a ruling that precluded him from further cross-examining various witnesses following commissioner questions. He asserts that those rulings and circumstances violated his right to be meaningfully heard, to examine witnesses, and to have a fair trial.

The Chemeketa coach also testified at the hearing in respondent's behalf, but his testimony about respondent was limited to respondent's interaction with Deuker at the first game. In response to a commissioner's question, the coach stated that he had not seen respondent at the end of the second game.

The attention of those witnesses had been somewhat diverted, because of the confusion on the field. Nonetheless, one of them, the assistant referee, had seen respondent start to cross the field toward the officials, which initially drew his attention; the other, the athletics director, had had her attention diverted only in the moments before the interaction between Allen and respondent. Both witnesses had seen Allen with his hands up, while at a distance from respondent, to stop respondent from proceeding further across the field toward the officials, and then had seen respondent turn away and leave the area.

As noted, respondent's son testified in support of respondent's account, but he had not witnessed it.

Respondent does not raise any issue about the extent to which Rule 2.1(C) implicitly may impose a materiality requirement; he also does not argue that this alleged misrepresentation, or those alleged in another count (Count 5), if proved, were not material. We do not address whether Rule 2.1(C) imposes a materiality requirement. But, in any event, we conclude that respondent's misstatement was material. See generally In re Herman , 357 Or. 273, 287, 348 P.3d 1125 (2015) (lawyer discipline; misrepresentation is material if it would or could significantly influence the recipient's decision-making process).

BAS initially testified that "[h]e" showed BAS the cabinet and issued the challenge to find the compartment with the gun, without identifying whether "he" referred to respondent or Mansell. As noted, though, BAS went on to testify that he asked respondent for permission to handle the gun, and respondent said "yes, go ahead." Given that context, we understand BAS's use of "he," to identify the person who challenged him to find the compartment with the gun, as referring to respondent.

BAS's earlier account to Lambert was hearsay, unless an exception applied. See OEC 801 (defining hearsay). Several witnesses offered testimony at the commission hearing that qualified as hearsay under OEC 801 and thus, under the Oregon Evidence Code, would be inadmissible in a court proceeding unless otherwise provided by law. OEC 802.
The Code does not apply in commission proceedings, however; instead, a commission rule of evidence, CJFDRP 13.d., applies. That rule provides, in part:
"Irrelevant, immaterial or unduly repetitious evidence shall be excluded. All other evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs shall be admissible."
At the hearing, respondent's counsel asked about hearsay evidence, and the chair responded that hearsay evidence was admissible, with the commission assigning it appropriate weight. Respondent does not challenge the admission of any evidence on that basis in this court.
We give weight to hearsay evidence in the record that is supported by other indicia of reliability-for example, as with BAS's recounting to Lambert, a recitation of events reasonably close-in-time to when those events occurred, which was documented immediately thereafter.

BAS was not asked at the hearing whether or not the gun was loaded.

Respondent's son did not testify at the hearing, but he signed a declaration under penalty of perjury, dated about a year after the incident and several months before the commission filed its complaint. His declaration stated that, while respondent had been in another part of the room with the stove, BAS had showed the son a maneuver with the gun, which had not been loaded, and given it back to him. The declaration further stated that respondent had "simply observed the interaction" between his son and BAS.

The commission, by contrast, found that respondent had been "disingenuous" about several discrete subjects involving the BAS-related counts, but those findings appear to have been based on the commission believing other witnesses' accounts instead of respondent's, not on any observation of respondent's demeanor or manner of testifying in relation to Counts 3 through 6.
The commission also found that Mansell's testimony about Count 3 was inconsistent with an earlier, sworn declaration that Mansell had submitted on respondent's behalf. After reviewing Mansell's testimony and that declaration, we do not view them as inconsistent.

See also ORS 45.400(3) (court may allow the use of telephonic testimony on good cause shown, unless outweighed by prejudice to the nonmoving party; factors in assessing prejudice include whether the ability to evaluate witness credibility and demeanor is critical to the outcome, and whether face-to-face cross-examination is necessary because the subject of the testimony may be determinative of the outcome).

Respondent argues that BAS had a motivation to lie-for example, to protect himself against felon-in-possession charges. Respondent also points to evidence in the record-deriving from a hearsay statement that BAS purportedly made to his assigned taxi driver-suggesting that BAS might have possessed his own gun while he was a probationer in the VTC.
The timing of BAS's possible possession of his own gun, in relation to whether he was still in felon status or had been reduced to misdemeanor status, is unclear. In any event, we disagree that BAS had a motive to lie about respondent's involvement in the two gun-handling incidents. As explained above, very shortly after the second incident, BAS provided information to court personnel about his own handling of guns while in respondent's presence-which placed his own legal status at risk-in the context of expressing his genuine frustrations about respondent's out-of-court contacts with him.

Relatedly, between the time of the first incident and BAS's recounting of that incident to Lambert several weeks later, BAS received out-of-state treatment for his TBI. That significant intervening activity could have affected his recollection about the first incident.

Although respondent never made an offer of proof regarding his intended cross-examination, the exhibits were admitted as evidence at the hearing. We infer from the exhibits that respondent intended to cross-examine BAS about the following facts, which the exhibits establish by clear and convincing evidence: the nature of BAS's conviction and probationary terms (which were standard terms); the fact that VTC hearings can be informal and involve humor, regardless of who is the judge; and the fact that respondent and BAS had repeated positive interactions during BAS's VTC hearings.
In reviewing BAS's testimony as a whole, as well as the nontransmitted exhibits, other exhibits, and testimony from other witnesses, we conclude that no new information would have been elicited from the nontransmitted exhibits, on continued cross-examination, that would have adversely affected our assessment of BAS's credibility in any significant way.

On direct examination, BAS was asked four questions about the first gun-handling incident; he was not asked about that incident on cross-examination or by the commissioners. Respondent's testimony was similarly brief. By contrast, Mansell provided a detailed description of the cabinetry and the size of the room, the location of each person in the room, and the order of events, and he answered a number of questions from the commissioners.

Respondent previously had provided a similar, but less detailed, description of that incident to the commission's investigator. Then, according to the investigator's report, he had not said that his attention had been drawn by discussion about the tactical maneuver; instead, he more simply stated that BAS had briefly shown his son a SEAL maneuver, while respondent had been "in another part of the room working with the stove and simply observed the interaction." Respondent was given the opportunity to review and provide revisions to the investigator's report, and his approved version was admitted into evidence.

When respondent and BAS joked about the firearms prohibition on those occasions, both of them, as well as others present in the courtroom, reacted with laughter. That context shows that BAS's firearms prohibition was a well-known fact.

Count 5 also alleged that respondent denied in a responsive statement during the inquiry that his son had brought a gun to BAS's house. The commission's opinion does not mention that allegation, likely because the report prepared by its investigator notes respondent's acknowledgement that he had become aware, near the end of the incident, that his son had brought the gun.

Because the commission makes no recommendation about Article VII (Amended), section 8(1)(b), under Count 5, we similarly do not discuss that rule.

Respondent's statement was also material, in that it could have significantly influenced Judge Rhoades's decision-making process, about whether to report respondent's conduct to the commission. See 632 Or. at 590 n. 29, 413 P.3d at 934 n. 29 (discussing materiality).

For example, respondent-who has a profound interest in military history and the armed forces-appears to have taken great personal pride in having a relationship with BAS, a former decorated Navy SEAL. Also, through his relationship with BAS, respondent also was able to meet other Navy SEALs, including one who was famous. By contrast, the record also shows that-other than once driving a participant home after a church service-respondent did not engage in out-of-court contacts with other VTC participants.

Respondent rejects the characterization that he "singled BAS out"-rather, he contends, the entire VTC team was understandably impressed with BAS's service and acted as a group to address his unique needs. We acknowledge that BAS had unique needs and that the VTC team sought to address them. But the record nonetheless shows that respondent engaged in out-of-court contacts with BAS (and not other participants) that placed BAS in a position of having to decide whether to respond favorably to respondent's invitations-such as inviting BAS to his home, driving out to BAS's home, taking BAS to a wedding, and engaging in multiple text exchanges with BAS.

Rule 3.7 provides:
"Rule 3.7 Decorum, Demeanor, and Communication with Jurors
"(A) A judge shall require order and decorum in proceedings before the court.
"(B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control.
"(C) A judge shall not praise or criticize jurors for their verdict other than in a ruling in a proceeding, but a judge may thank and commend jurors for their service. A judge who is not otherwise prohibited by law from doing so may meet with jurors who choose to remain after trial but should be careful not to discuss the merits of the case."

The complaint alleged other misconduct relating to the Hall, violating both Rule 2.1(A) and also Rule 2.1(C) (prohibiting conduct reflecting adversely on character to serve as judge). The commission, however, did not recommend any rule violations based on those additional allegations, so we do not address them.
In relation to purportedly soliciting funds, the commission also determined that respondent violated Rule 4.5(A), which prohibits a judge from personally soliciting funds for an organization or entity. But the complaint did not allege that violation, and we do not consider it for that reason.

Count 12 alleged only a violation of Rule 3.3(B); it did not make any allegation about respondent's direction to his staff to provide inaccurate information to same-sex couples, concerning his availability to solemnize marriages. As noted earlier, the commission nonetheless determined that that latter conduct violated Rule 2.1(D) (prohibiting conduct involving dishonesty, deceit, or misrepresentation), but we do not consider it, because it was not alleged in the complaint.

Because the commission makes no recommendation as to Article VII (Amended), section 8(1)(c), we do not discuss that allegation.

Our determination is subject to affirmative defenses that respondent raises, as explained later below.

Respondent and amici CLS and Hall also argue that, because the act of solemnizing marriages is optional, it cannot be considered a "dut [y]." We disagree. Although a "duty" ordinarily may be thought of in terms of an obligation or mandated activity, if a judge undertakes to perform an optional activity that is statutorily authorized by virtue of holding judicial office, then that activity qualifies as a judicial "dut[y]" under Rule 3.3(B).

Before the current Oregon Code of Judicial Conduct was adopted in 2013, former JR 2-110(B) (2012) prohibited a judge from acting "in a way that the judge knows, or reasonably should know, would be perceived by a reasonable person as biased or prejudiced toward any of the litigants, jurors, witnesses, lawyers or members of the public."Oregon Rules of Court v I-State 533 (2012).

The commission additionally found that respondent's conduct in relation to BAS demonstrated a pattern of self-benefit. We do not think that the record shows that type of pattern, in connection with that particular misconduct. While it is apparent that respondent took great pride in his relationship with BAS, it is equally apparent that respondent's general conduct in engaging with BAS-although lacking in sound judgment in several respects-was undertaken in an effort to provide practical and emotional support. (We additionally note that, in reaching a contrary conclusion, the commission relied on many factors involving evidence about allegations that either were not supported by clear and convincing evidence or that involved peripheral issues.)

In State v. Robinson , 217 Or. 612, 616, 343 P.2d 886 (1959), the court observed that firearms subject to the statutory prohibition in ORS 166.270(1) are plainly dangerous, "especially if possessed by one whose past conduct revealed a disregard for law and the normal moral restraints." See also Bailey v. Lampert , 342 Or. 321, 327, 153 P.3d 95 (2007) (legislature determined that person with present status of a "felon"-even if status might later change due to post-conviction appeal or set-aside-"falls within the class of persons that are not permitted to possess firearms"); see generally State v. Rainoldi , 351 Or. 486, 499-504, 268 P.3d 568 (2011) (summarizing history behind statutory felon-in-possession prohibition).

The other case in which this court has removed a judge is Field . That case involved a series of misconduct by a district court judge over a period of time that primarily involved persistent mistreatment and disrespect of lawyers, parties, and witnesses, and inappropriate practices in criminal cases where defendants were represented by counsel. 281 Or. at 630-34, 576 P.2d 348. The court characterized the judge's actions as "general incompetent performance of judicial duties" and also recognized some medical issues that likely had affected the judge's ability to perform those duties. Id. at 634, 636-37, 576 P.2d 348.

As explained, Jordan I involved a judge's collaboration with a complainant about a criminal incident; the devising of a plan with that complainant about how to process resulting charges against potentially vulnerable defendants; depriving those defendants and their counsel of the right to be heard; and then later lying under oath in a related court proceeding about having any recollection of the initial contact that had prompted the collaboration. 290 Or. at 333-34, 622 P.2d 297.